SAMUEL CLARKE, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] Persons of color are competent witnesses in all cases, just as white persons are.

[2.] When a homicide is proved, the law presumes malice, and unless the evidence should relieve the slayer, he should be found guilty of murder.

[3.] The jury in criminal cases being made the judges of both law and facts, their finding will not be disturbed, unless it be clearly wrong.

[4.] The law decides upon the competency of witnesses, and the jury upon their credibility.

Murder.    In Spalding Superior Court.    Tried before Judge Speer.    July Special Term, 1866.

The plaintiff in error was tried for the murder of Daniel Kerbow.

When the colored witnesses were introduced by the State, the prisoner objected to their competency.    The Court overruled the objection.

*Evidence for the State.*

*Kitty Ann Neal, a person of color*—The difficulty commenced about a bread tray.    Deceased sent Indiana, his daughter, to get a bread tray, to Mary Clarke's, to make up bread for his dinner.    Mr. Kerbow, the deceased, lived down by the new graveyard in Griffin.    The difficulty occurred day before yesterday between 12 and 1 o'clock.    Witness was present.    Eliza and Mima Barnet were also present, and some small children.    No white person present but defendant, his wife, and the deceased and Indiana.    Indiana

went into the house, and did not see the difficulty. The house has two rooms and three doors—two doors toward the kitchen; two doors in the kitchen—door to each room, fronting to the house. Road runs south of the house. Deceased was in the room of his own house farthest from the road. Indiana went to defendant's house, who, with his wife, lived in one end of the kitchen, for the tray. Mima lived in there with them. Deceased sent to Clarke and wife for the tray. I was in the adjoining room when she went after the tray—heard the conversation after she went there. Indiana asked for the bread tray. Defendant's wife said as long as he accused her of stealing the meat and meal, and salt, deceased should not have the tray to save his life—said she would see him in hell before he should have it. Deceased was standing on the steps of his house. Defendant was lying on the bed in the room where he lived—wife was in there also. Deceased said he thought it was mighty hard he had bought a tray, paid his money for it, and could not get it to make up bread for his dinner. Defendant's wife said she had bought the tray, and it was hers, and before he should have it, she would put it into ashes, a damned old rascal. Defendant's wife is deceased's daughter. Deceased said that he would have it—that he would be damned if he did not have it. She said he should not have it to save his infernal old life. Deceased said it was a lie—her buying the tray—that he bought it himself. He gave her the lie two or three times, when the defendant stepped up and said, "Look here, old man, you must not give my wife the lie, or curse her either; if you do, I will give you what you don't want, and that will last you your life time." Deceased said it is a lie—you take it up, sir; if you do, help yourself. Defendant said, "Yes, I do take it up, for Mary is my wife," and shot. The ball went through the door. Deceased then jumped down, picked up a brickbat and threw it at him, and hit the wall of the house. Defendant then shot at deceased, and hit him in the arm. Deceased fell—fell right at the steps, his head up against the steps of the house, and

hallooed, "Oh, Lordy! Kitty, help me!" Defendant then stepped up and shot him again, after he was down—shot him in the side—then went back into the house, got his coat, and put it on as he ran towards the old grave yard. Deceased still lay there hallooing. I helped him into the house and on to a bed, and gave him some water. This was between 12 and 1 o'clock in the day. He lived until a little after twelve the same night, when he died. His wife was not present. She was sent for, and came about 2 or 3 o'clock in the evening.

*Cross-Examined*—What defendant's wife said about deceased not having the tray was said to Indiana, the daughter of deceased. Deceased was sitting on the steps of his house. Indiana went back and told her father. Then deceased went to the other end of the kitchen where the negro women were staying and asked Eliza if that was not the tray he bought. She replied, there were two, and they were so much alike she could not tell. He said he intended to have it, and went on back and sat on the steps, and, while there, said he would have the tray if it cost him his life. Defendant shot him with a pistol. The ball that missed him, when defendant fired first, went into the door close to where deceased was standing. After defendant had shot three times, he presented his pistol as if going to shoot again. I begged him not to do so, and he then got his coat and went off.

*Eliza Thomas, a person of color*—I was lying on the bed sick in the room adjoining defendant's in the kitchen when the difficulty began. The first I saw, deceased came down his steps and said to defendant's wife, God damn her, he intended to have his tray—it was his. He then stooped down near the steps and asked defendant if he took it up. Defendant said yes, he would protect his wife anywhere. Deceased then said to him, help yourself if you can. Defendant then shot at deceased, and missed him. Deceased then stooped down, picked up a brick and threw at defendant, but never hit him. Defendant then shot at him and

hit him in the shoulder, and deceased fell, and after he fell he shot him again and hit him in the side. From defendant's door to deceased's door is about twenty feet. After he was shot the second time, defendant put on his coat and ran, and deceased rose, went into his house, and fell on his bed. Before defendant fired the first time, and after he had pulled his pistol out, I heard deceased say, I am done with it. Deceased died between 1 and 2 that night. What I saw was seen through a crack. Saw deceased stoop down. Don't know what he picked up. Heard the brickbat strike the house. Heard deceased say to defendant, God damn her, he would have his bread tray in spite of hell, and then went. to the well and got a bucket of water—carried the bucket in his room, came out, and commenced again, and defendant said, " Old man, let us talk in reason." Deceased asked him if he took it up. He said, yes, he would protect his wife anywhere. Deceased had stooped down before defendant ever fired.

*Dr. Thomas M. Darnall*—Am a physician. Was called professionally to aid in a *post mortem* examination of deceased at his house on yesterday, the 2d of August. His house is in Griffin, and in Spalding county. I went at the request of Dr. Knott. We made it. We opened first the abdomen, examined its contents, and then raised the breast bone, or chest. The shot that struck the shoulder entered the chest between the 3d and 4th ribs. Did not examine the lung critically. Found considerable blood in the cavity of the chest. Second wound was below—entered between the ribs and passed through his body and lodged against the ribs on the other side. Either of the wounds would, in my opinion, have proved mortal, and he died from the effects. The shot was in the left shoulder and on the left side.

*Dr. Edward F. Knott*—Am a practicing physician. Was called to see deceased about 2 o'clock day before yesterday. Found two wounds—one through the shoulder, the other between 7th and 8th ribs. Wounds were inflicted by leaden balls used in pistols (produced the balls.) Attended him in

his last hours.   He died  about 2 o'clock A. M.    Visited him four times that afternoon and evening.   He seemed to be conscious of his situation.   He stated to me : " Dr., I shall die, and you know it ; I am  now on  my death-bed ; I shall speak the truth.   My son-in-law, Clarke, shot me, and my wife was  the  cause of it, and it will be  the  cause of my death."   This was at the  last visit I made in  the afternoon. Deceased died from the wounds.   All of his organs were otherwise healthy.   He died in this county.

*John L. Doyal*—Am deputy marshal of the  city of  Griffin.   Had a warrant placed in  my hands  for the  arrest of defendant.   Executed the warrant.   Arrested defendant about thirty miles from here, in Meriwether, about 4 o'clock yesterday, 2d day of August.   Got a pistol from him—the one produced.   Four barrels were  empty—two loaded.   It was a six shooter.   When deceased was once confined in guard-house here, he accused Clarke and his family of having him  put there, and said he intended to  kill him if he ever got a chance.   I told Clarke about it some weeks afterwards.   This was in February or March of this year.

The Court charged the jury that when a homicide is proved, the presumption is that the  killing is murder, and that it was for  the evidence to  show justification, or to reduce the offence to a lower grade.

After a verdict of guilty, the prisoner moved  for a new trial, on several grounds :

1. For error in admitting the colored witnesses.

2. For error in the charge of the Court.

3. Because the verdict was contrary to  law and evidence, the facts making a case of voluntary manslaughter only.

4. Because the verdict  was contrary to the weight of evidence.

The Court refused to grant a new trial.

DOYAL and NUNNALLY, MARTIN and DISMUKE, for  plaintiff in error.

HAMMOND, Solicitor General, for the State.

WALKER, J.

[1.] We think the effect of the act of 17th March, 1866, *Pamp. Acts, p.* 239, entitled, "An Act to define the term 'persons of color, and to declare the rights of such persons," was to make persons of color competent witnesses in all cases, just as if they were white. In other words, that all distinction, on account of color, was done away with, so far as competency to testify is concerned; and, for myself, I will say, I think it conferred on them the full civil rights of a citizen, and made them, before the law, entitled to all the civil rights enjoyed by white persons. We do not feel disposed to fetter the enjoyment of those rights by technical criticism, but desire to carry out in good faith the legislative will.

[2.] The Court charged the jury, " that when a homicide is proved, the presumption is that the killing is murder, and that it was for the evidence to show justification, or to reduce the offence to a lower grade." In *Cohron vs. The State*, 20, *Ga. R.* 760, this Court says, " that the son was slain by the father was not denied. In contemplation of law, the homicide was murder; and it was for the slayer, by proof, to relieve himself from this presumption, to reduce the offence from murder to manslaughter." In *Choice vs. the State* 31, *Ga. R.* 464, the Court says: "The State having proved the homicide, closed, as the law would imply malice from the killing." "When a man commits an unlawful act, unaccompanied by circumstances justifying its commission, it is a presumption of law that he has acted advisedly, and with an intent to produce the consequences which have ensued. See *Dixon's case* 3, *M. & S.* 15. Thus a presumption of malice arises in many cases. 'In every charge of murder,' says Mr. Justice Foster, 'the fact of killing being first proved, all the circumstances of accident, necessity, or infirmity, are to be satisfactorily proved by the prisoner, un-

less they arise out of the evidence produced against him, for the law presumes the fact to be founded in malice, until the contrary appears.' *Foster* 255; 1 *Hale, P. C.* 455; 1 *East, P. C.* 340." *Ros. Cr. Ev.* 21. These authorities—and the number might be greatly increased—we think, fully sustain the charge of the Court as given in this case.

[3.] Should a new trial have been granted on the grounds that the verdict was contrary to law and evidence, and the weight of evidence? "The jury being made the judges both of the law and the facts in criminal cases, their verdict will not be disturbed, unless it be clear that the defendant has been wrongfully convicted." *Revel vs. The State,* 26, *Ga. R.* 276. It is insisted that the evidence shows a case of voluntary manslaughter, and not murder. Is it "*clear* that the defendant has been *wrongfully convicted*" of murder? Without critically analyzing the testimony, I deem it necessary to say only that it showed the existence of a very bad state of feeling between the parties; and a pretty clear inference is, that the deceased was, in his own family, *alone,* save the society of his little daughter, Indiana. The expression used by him to Dr. Knott, when all hope of life was gone, is full of meaning. The presence of the old man, for reasons not disclosed in this record, was not wanted in that family; and this was seized as the occasion to be forever rid of him. As to the provocation given defendant by the language of deceased to his daughter, the wife of defendant, it would seem that she was a match for her father in the use of "Billingsgate;" and this was, therefore, no such provocation as to justify or mitigate the conduct of defendant. There is no assault proved to have been made on defendant before he shot at deceased, for both witnesses say he picked up the brickbat *after* defendant had shot at him; and one of the witnesses says: "Before defendant fired the first time, and after he had pulled his pistol out, I heard deceased say, '*I am done with it.*'" There being no assault on defendant, nor attempt to commit a serious personal injury on him by deceased, nor other equivalent circumstances to jus-

tify the excitement of passion and exclude all idea of delib-
eration or malice, we think that not only is it *not* " clear
that the defendant has been wrongfully convicted," but that
" all the circumstances of the killing show an abandoned
and malignant heart."

[4.] As to its being a verdict founded on the testimony of
" persons of color," all we have to say is, that the law makes
them *competent* witnesses, and it was the right and duty of
the jury to judge of their *credibility*.   We are satisfied the
jury did their duty in the premises; this was the opinion of
the Court below also.   But if the testimony of the colored
persons were out of the case, would not the defendant be
found guilty of murder?   The killing was proved by the
dying declarations of the deceased; the law implies malice,
and that the testimony in the cause must show a grade of
homicide below that of murder, otherwise the defendant
must be convicted.   The negro testimony aside, where is any
testimony to show any sort of mitigation whatever?   We
see none, and are inclined to hold that the verdict should
have been the same upon the testimony of the white wit-
nesses alone.   We think the Court did right to refuse a new
trial.

Judgment affirmed.