STATE OF IOWA, Appellee, v. CLARK TROY, Appellant.

JUNE 26, 1928.

REHEARING DENIED OCTOBER 19, 1928.

*John L. Duffy,* and *Frantzen, Bonson & Gilloon,* for appellant.

*John Fletcher,* Attorney-general, and *Neill Garrett,* Assistant Attorney-general, for appellee.

MORLING, J.—Three others, Emmett Kirby, Joseph Kirby, and Melvin Zuber, were, with appellant, jointly indicted for the murder of Charles Hos. The appellant, Clark Troy, moved for and was granted a separate trial. Zuber was a witness for the State. Emmett Kirby was a witness for the defendant. Joseph Kirby's whereabouts appear to be unknown.

The four defendants went by automobile to the home of the decedent, Charles Hos, somewhere between 9:15 and 10:30 P. M., September 21, 1927, to obtain whisky. The State's claim is that the defendants' purpose was to get it by "hijacking" Hos. The appellant and Emmett Kirby's claim is that some arrangement had been previously made between Buster Lyon and Hos for the whisky, and that they proceeded to the Hos home in accordance therewith, to get it. A loaded shotgun was in the car in which the defendants rode to the Hos home. Zuber testified that the two Kirbys, Lyons (a younger brother of Buster

Lyons'), appellant, and Zuber got in the car at the Lyons' house; that Lyons put a shotgun in the back seat; that appellant, Joe Kirby, and Lyons sat in that seat; that they went to the Hos house; that, when near the Hos garage, where Hos was found, appellant and Emmett Kirby said, ''We are going to 'hijack' this place;'' that he understood by ''hijack,'' robbery; that, when they got to the garage, Emmett and Zuber got out of the front seat, and appellant and Lyons ''got out of the back seat, and with that, Clark Troy ordered Hos to hold up his hands and back into the garage. Troy had a shotgun in his hands. When Mr. Hos was ordered to put up his hands and back into the garage, he backed into the garage. He put his hands up. Next, a shot was fired. Clark Troy fired the shot. The shot was fired as soon as we arrived. When the shot was fired, I run to the nearest telephone, and called the sheriff, and told him what happened. I told the sheriff to meet me in Jones and Locust Streets, and that is where I met him. I took him to the Hos home. * * * Charley Hos, when he had his hands up, couldn't have taken over two steps when he was backed up. * * * Clark Troy ordered Hos to back into the garage. He did so, and took about two steps, and fired the gun. There wasn't anything said in the car about shooting Hos.''

Hos was wounded in the abdomen, and died therefrom a few days later. Two men named Lester were in the garage at the time. Zuber testified that the Lesters were in the garage before he and the others came; that ''one of the Lesters said, 'There is no whisky here.' After this statement was made by the Lesters, the shot was fired,—right afterwards.''

A 13-year-old son of deceased's testified that the men in the car ''got out, and Troy stuck a gun on my dad, and told him to stick them up; and he didn't, at first, but then he did. * * * My father didn't stick them up until the second time they told him to. * * * He said, 'They can go and search the place,' and they said, 'We will search the place, and will shake it down to find it.' * * * Troy had the gun. * * * He was the man that told my father to put up his hands. I saw the gun in Troy's hands at the time the gun was discharged. * * * After the gun went off, they all went away from the place, and when I got back, the car was backing out of the alley. After I got back from telling my mother what happened, the Emmett Kirby guy

and Troy came back. * * * they kept on saying—asking him [deceased] to say it was an accident; and then they said they would pay my dad's expenses and the bill while he was laid up. They just asked my mother to say—they brought the gun, and asked her to say it was his gun. Troy said to say it was my dad's gun. * * * 'You will say it was an accident?' * * * I saw the defendant, Clark Troy, get out of the car. He had a gun in his hands when he got out.''

The sheriff testified that Emmett Kirby, in the presence of defendant, ''said it was he who did the shooting, and when the question was put to them as to whether or not they went up to 'hijack' the place, they said, "We might as well tell you; you will only find out anyway.' Both Clark Troy and Emmett Kirby admitted they had, and they said at that time that the shooting was an accident. * * * It was the night of September 21st, shortly after I got Clark Troy and Emmett Kirby to the jail, that they said they went up there to 'hijack' the place. * * * I had a further talk with the defendant, Clark Troy, about the shooting. He made a voluntary statement that it was he who done the shooting. Speaking with Clark Troy, I referred to the 'hijacking' in that conversation, and he said, 'well,' that it wasn't exactly 'hijacking.' ''

The sheriff also says:

''Boys told me that they went to 'hijack' booze from Charles Hos. * * * Boys only told me once. * * * In common parlance, 'hijacking' means the robbing of booze.''

The deputy sheriff testified:

''Kirby and Troy said to Zuber: 'Where did they get you at?' Clark Troy, in my presence, said to the sheriff that night that they went up with the intention of 'hijacking' for liquor.''

The dying statement of Hos says that appellant ''had a shotgun in his hands. He ordered me to hold up my hands, then ordered me to back into the garage. When I backed into the garage, while I had my hands over my head, Troy shot me * * * Before Troy shot me, he and the two Kirbys told me they came to hold up the place and get the stuff.''

Defendant testified:

"Emmett and I had gone up to the Hos home to get some whisky we had ordered;" that he (appellant) "started to take the pump, jack, and tire-changing tools, and I think there was a blanket, or a coat,—or I don't know what it was. It was something Emmett had thrown into the car, to cover the whisky with, and the shotgun was laying in the car, and I don't know what it was; but I reached over to pull the two of them out, and the shotgun went off; and Charlie Hos was standing directly behind me, and I heard somebody say, 'I am hit.' "

He also says:

"We didn't have any whisky bought from Mr. Hos; we had the whisky bought from Buster Lyons. Buster Lyons, we knew, was buying it from somebody else. That is, he said he could get it for us, but he didn't have it."

He says that they didn't tell the sheriff that they went up there to "hijack" the place.

"What was actually said was that we denied, at first, that we went up there after whisky. * * * The shotgun was discharged as I was reaching into the car to pull this shotgun out, to put it onto the front seat, together with the blanket and other things in the car, to make room for the whisky. * * * The shotgun was laying on the floor * * * [indicating], and I felt, as I picked up the blanket—or I don't know what it was, but anyway, something that was there to cover the whisky with; and I took hold of the shotgun, and went to take hold of it, when it went off; and I don't know whether the hammer was up, or how it happened."

His credibility as a witness is impeached by his testimony that he had been convicted of felony, and had been in Minnesota state prison. He is materially contradicted by his own witnesses.

Emmett Kirby, as a witness for defendant, says that he got out of the car, and appellant "got out on the other side, and when I came in, I says, 'Is everything all right?' and he [Hos?] says, 'No, Emmett, I am sorry, but I couldn't get the stuff,' * * * I looked around there, and I seen Clark [appellant] fooling around the car, around the door; and I says, 'Clark, you don't have to clean that out,—Charlie [Hos] didn't get

to the stuff. It is all off with the Lesters.' * * *. He was cleaning the car a short time,—not a minute. When he completed cleaning the car, he come over to us. At that time, when he turned around, I saw the shotgun in his hands. There was nothing else in his hands, but there was a blanket on the running board."

One of the Lesters testified:

"The first in was Emmett and Joe Kirby and Charlie Hos, and they all stood there looking at each other, and not a word was spoken until after the shot was fired. * * * When Emmett Kirby stepped out of the car that evening, he came into the garage, he said, 'Christ, it's the Lesters.' Was standing by my car; didn't have a gun on me, nor my brother."

The other Lester testified that he had been in the garage about twenty minutes.

"Around half past ten, a car come down the street, and drove into the garage. Several men got out of it, and one of the men, when he jumped out of the car, he says, 'It's all off, boys, it's all off,' and a shot was fired."

The testimony of defendant's witnesses also is to the effect that, immediately upon the explosion, the appellant exclaimed that the shooting was an accident. They assert that the appellant and his companions were at the Hos place in pursuance of a previous arrangement by which they were to get liquor there; that decedent said he knew it was an accident, "But what will my wife say?"

There is testimony tending to show that a hole in appellant's jacket was torn by the shot. We, of course, do not undertake to set out all of the evidence and its inconsistencies. The question here is whether it is sufficient to sustain conviction.

I. What lawful, peaceable, or innocent purpose the occupants of the car could have had in taking a loaded shotgun with them is not explained. None is suggested. That they were in search of contraband liquor; that they intended to obtain it by menace and assault; that they had a loaded shotgun for use in the enterprise, with the intention to use it, at least to menace and intimidate Hos; that the appellant, in getting out of the car, had the gun in his hands for that purpose; that an assault

upon Hos with a loaded gun was contemplated; that the assault was made, and that it was imminently perilous to Hos's life; that there was neither justification nor palliation of the "hijacking," or for the use in such manner of a dangerous weapon,—were conclusions within the province of the jury to draw. It was not necessary for the State to prove express malice or personal hatred or ill will. The evidence permits a finding of a depraved mind and heart, reckless disregard of human life and safety, a wicked and mischievous purpose to perpetrate a wrongful and injurious act, without legal justification, extenuation, or excuse, and therefore sustains the finding of malice. *State v. Burris*, 198 Iowa 1156; 29 Corpus Juris 1084; *Commonwealth v. Bedrosian*, 247 Mass. 573 (142 N. E. 778); *Scott v. Commonwealth*, 143 Va. 510 (129 S. E. 360).

The jury might find that appellant formed the purpose of using the weapon before he left the car. The testimony tends to show that appellant and his companions expected to find liquor at Hos's place; that they were told there was none there; that they believed liquor was there, and intended, by menace and assault with a dangerous weapon, to obtain it.

" 'And when a man assaults another with, or uses upon another, a deadly weapon in such a manner that the natural, ordinary, and probable result of the use of such deadly weapon in such manner would be to take life, the law presumes that such person so assaulting intended to take life.' " *State v. Pinkerton*, 201 Iowa 940, 946.

See, also, *State v. Dillingham*, 143 Iowa 282.

"Premeditation and deliberation need not exist for any particular length of time before the killing, and may be proved by circumstantial evidence." *State v. Kneeskern*, 203 Iowa 929, 948.

See, also, *State v. Fuller*, 125 Iowa 212.

Malice aforethought, willful, deliberate, and premeditated killing, the essentials of murder in the first degree (Code of 1924, Section 12911), might, therefore, by the jury be found from the evidence. Appellant's motion to direct a verdict, and his contention that the evidence does not sustain the verdict, cannot be sustained.

II. Appellant complains that his request for instruction on the law of manslaughter was not granted. The court did charge fully upon this subject. He also submitted the question of the defendant's guilt of murder in the second degree. As the jury found the defendant guilty of a homicide of a higher degree than murder in the second degree, which is above manslaughter, any error (as to the existence of which we do not inquire) in instructions on the subject of manslaughter was without prejudice.

III.· Appellant complains that his theory that the gun exploded and Hos was killed by accident was not, in terms, submitted. Also that the court did not give proper instructions on the subject of conspiracy and robbery; that intoxicating liquor cannot be the subject of robbery, and the furnishing (purchasing?) of intoxicating liquor is not an unlawful act; that there is no evidence of the existence of conspiracy or the commission of the crime of robbery. The court did not instruct upon the subject of robbery or attempt to perpetrate that crime. He charged that "holding up, or 'hijacking,'—that is, forcibly taking property or liquor from the decedent against his will,—would be an unlawful act, as contemplated in the instructions." Quite lengthy instructions on the subject of conspiracy were given. We are not called upon to analyze the instructions or pass upon them or upon the legal questions argued by appellant in this connection, for the reason that, if any error in any of these respects was committed, it was without prejudice.

The charge in the indictment is the simple one that defendant did, upon the body of Hos, willfully, feloniously, deliberately, premeditatedly, and with malice aforethought, commit an assault with a deadly weapon, a shotgun charged with powder and bullets, with the specific intent to kill and murder Hos, willfully, etc. It charges neither conspiracy nor robbery, nor does it contain other like specifications which would limit or restrict the State in making its proof to a case of murder in the perpetration of a robbery or fulfillment of conspiracy: The court, in defining the crime of murder in the first degree, made no reference to its commission in the perpetration of robbery, etc., as defined in the alternative clause in Section 12911, Code of 1924. The court charged that, in order to convict, there

must be established beyond all reasonable doubt that defendant or some persons acting under a design or plan of conspiracy to do an unlawful act killed Hos; that the killing was done feloniously, willfully, deliberately, premeditatedly, and with malice aforethought, and with the specific intent to kill Hos; that, if the State had failed to prove any one of these propositions beyond all reasonable doubt, the jury should acquit. The court told the jury that, if defendants agreed to make an attempt to hold up Hos, and take from him intoxicating liquors forcibly and against his will, and, while acting in furtherance of a common design, either of them did, in the presence of the other, willfully, feloniously, deliberately, premeditatedly, and with malice aforethought, and with the specific intent to kill and murder, kill Hos by shooting him, appellant would be guilty of murder in the first degree; but, if the State had failed to establish each and all of these propositions, then it would be the duty of the jury to acquit.

If the shot was not an accidental explosion, it was fired by appellant. That the shot was fired while defendant alone was handling the gun is admitted. The jury were plainly told that the defendant could not be convicted unless the killing was done willfully, deliberately, and premeditatedly. The jury were further told: By "deliberation" is meant that the killing must have been deliberate, as distinguished from an act done in the heat of passion, or resulting from accident, surprise, or sudden impulse. By "premeditation" is meant that the specific intent to kill was considered, and the consequences weighed, and the resolution to kill formed, and that it was done in pursuance of a design so formed. By saying that the killing must be willful, it is meant that the person taking the life wills the death of the deceased, and kills the deceased in pursuance of a design to kill.

To require the court to say to the jury that they must find that the shooting was not the result of accident is merely to require useless iteration in equivalent terms.

In order to convict, the jury was required to find that the killing was done feloniously, willfully, deliberately, premeditatedly, and with malice aforethought. Under the instructions, these elements must have been found, whether or no there was any conspiracy. In addition, however, the jury was required to find the existence of the conspiracy, as defined by the court.

The State was required by the court to prove not only every necessary element of murder, as defined by the statute, but also a conspiracy,—an unnecessary and excessive requirement, of which and the finding thereon the defendant may not complain. The jury must have found the existence of such conspiracy; but they did find, regardless of conspiracy, the existence of every element of the crime of murder in the first degree. Any error, if there was such, therefore, on the subjects complained of by appellant, was without prejudice.

IV. Appellant requested the court to instruct that the dying declaration was not entitled to the same credit, but was intrinsically weaker than if deceased were still alive, and testifying in the presence of the jury under oath, and subject to cross-examination, and should be carefully scrutinized; that it was a species of hearsay, and the jury alone were the judges of its weight and credibility. The court refused this instruction. He charged that the dying declaration, as evidence, should be considered under the same rules that govern in determining the credibility of witnesses who testify from the stand. The evidence is that, immediately before signing the statement, Hos said he was going to die; that the doctor told Hos "at that time that he was about to die, and Charles Hos said that he knew it;" that he was asked, "Realizing that you are about to die, is that statement true and correct?" and he said it was. He died about five hours later. The instruction given was correct, and the refusal to give that asked was not error. *State v. Schmidt*, 73 Iowa 469.

V. Appellant asked the court to charge that the evidence was that defendant "made certain admissions appearing in evidence. Verbal statements or admissions should be received by you with great caution, as they are subject to much imperfection and mistake," owing to absence of clear expression, understanding, and to unintentional alterations. The statements of appellant offered in evidence were not a confession. He told the sheriff that the shooting was accidental. The statements consisted of admissions of appellant's purpose in going to the Hos place. They were testified to by different witnesses, and appear to have been made understandingly and deliberately,

with a purpose of giving appellant's version of the circumstances. The refusal to charge was not error. *State v. Jackson*, 103 Iowa 702; *State v. Grba*, 196 Iowa 241.

VI. Complaint is made of exclusion of appellant's testimony that a hole in his jacket which was received in evidence was made by the discharge of the gun. The record, however, plainly shows the existence of that fact.

Appellant complains of the court's refusal to permit witnesses' testimony as to the arrangement between Lyons and Hos for liquor to be delivered about the time the tragedy occurred, and the testimony that Hos was engaged in the business of selling liquor. The facts, so far as material, otherwise sufficiently appear, and there was neither error nor prejudice in these rulings.

Appellant's counsel has filed an elaborate and thorough argument, setting up thirty-seven assignments of error. We have discussed all of the points of importance. Appellant had a fair trial. No prejudicial error appears.—*Affirmed*.

STEVENS, C. J., and DE GRAFF, ALBERT, KINDIG, and WAGNER, JJ., concur.