STATE OF IOWA, Appellee, v. JOHN M. MERCER, Appellant.

No. 43829.

SEPTEMBER 22, 1937.

Arthur Lund and Popham, Toomey & Davis, for appellant.

John H. Mitchell, Attorney General, B. J. Maxwell, and R. A. Potter, for Cedar County.

Marion C. Hamiel and Buell McCash, Spec. Asst. Attorneys General, for appellee.

MITCHELL, J.—The facts in this tragedy are not in dispute. On the morning of August 8, 1930, Sheriff C. H. Elwood of Cedar County received a telephone call from the police depart-

ment of Davenport, stating that the Lage Drug Store of that city had been held up by three men and robbed, and that the bandits had left Davenport on Primary Road No. 74, headed in the direction of Tipton. The car in which the robbers were driving was described; also that it carried orange-colored license plates. Immediately the sheriff proceeded to do his duty. He asked John Carey, a constable, and Robert G. Sproat, a vigilante, to go with him.

The highway runs in an easterly and westerly direction. The sheriff and his men drove five and a half or six miles east of Tipton when they met a car answering the description. They turned their car around and followed the other car to a point about two miles east of Tipton, commonly known as "Charles Ochiltree hill". The sheriff was driving. At his right sat Carey and Sproat was sitting in the back seat. The car was stopped on the north side of the road. Carey got out, walked around the front of the sheriff's car and east along the south side, towards the car that was approaching. · He motioned to the driver to stop, which he did, at a distance of approximately fifteen feet behind the sheriff's car. Carey approached the car, with a gun in his hand. Robert Sproat, with a gun in his hand, stepped out of the back seat of the sheriff's car, on the north side, and approached the car that had been stopped.

In the auto that had been stopped were Roy Mercer at the steering wheel, his brother John Mercer at his right, in the front seat, and Wain S. Kile in the rear seat. Carey said to the men, "You look like the men we're looking for." Roy Mercer pointed his gun at Carey and pulled the trigger, but the gun did not discharge. By this time Sproat was walking between the rear bumpers of the sheriff's car and the front fenders of the car that had been stopped, when John Mercer, who had a 45-calibre revolver in his hands, fired at Sproat, who staggered across the street and fell into the ditch on the south side of the highway, dying shortly thereafter. Roy Mercer also fired his gun but did not hit anyone. The Mercer car then drove at a terrific speed down the highway to Tipton and turned north and east. After traveling some little distance the car tipped over near a field in which Robert Moore, a farmer, was working. Kile was injured and the Mercers asked Moore if he would take his car and drive them to a hospital. Moore of course had no idea who the men were, and thinking that he was helping some unfortunate individual who

1136

had been injured, got his car and the three men got into it. John Mercer pointed his gun at Moore and ordered him to drive in a certain direction. For twelve hours they kept Moore a prisoner, finally ending up in East Dubuque. Thereafter the Mercers separated.

Some five or six years later John Mercer, the defendant, was arrested in California and brought back to Iowa to answer for the taking of the life of Robert Sproat. At first he pled "not guilty". He was represented by distinguished and able counsel. His plea was changed to that of "guilty". A hearing was held before the Hon. F. O. Ellison, one of the judges of the district court of Cedar County, to ascertain the degree of punishment that should be inflicted. Various witnesses testified. A written confession made by John Mercer, was introduced without objection. It told the story of a life of crime, of committing over fifty major offenses before the killing of this innocent man, and in detail it described the murder of Robert Sproat. The able trial court, before pronouncing sentence, listened to the evidence and gave to the defendant every opportunity to present any evidence he might desire. He asked the defendant if he had anything to say and the defendant replied, "No." The defendant did not see fit to take the witness stand. A full and complete hearing was held. The judge then fixed the sentence at death.

The question that confronts us here is not whether the appellant is guilty of this crime. There is no dispute in the record. The appellant's story and the stories of all the other witnesses are the same. Appellant confessed the crime; he pled guilty. The sole question at issue is the measure of punishment.

It is the contention of the appellant that a life sentence is ample and that the facts do not warrant the scaffold. However, it is interesting to note that in the appellant's brief and argument filed in this case the following is contained:

"There can be no greater punishment than life imprisonment;—death penalty is quickly served and then there is no more. But with life, it is endless punishment and mental worry till the day when nature has run its course."

Whether or not a life sentence is a more severe punishment than that of a death sentence, is a question the writer of this opinion is not able to answer. To spend the rest of one's life behind prison bars, with the thought ever before him of having taken

the life of an innocent man, is indeed severe punishment, for "in the calmness of his prison cell his mental tortures would know no bounds." It must be kept in mind that it is not the courts that fix the punishment that shall be meted out to those who disobey the law. It is the people, speaking thru their chosen representatives in the legislature of this State, who fix the punishment. The legislature has prescribed the death penalty, and, whether it meets with our approval or not, as long as that remains the law of this State, it is our duty to see that it is so enforced. John Mercer of his own free will chose a life of crime. He confessed to more than fifty major offenses, and it should be noted that that confession is in writing—in his own hand-writing. A reading of it would clearly convince anyone that no person had any part in preparing the confession except John Mercer himself. It covers seventeen pages of tablet-size paper, is in his own handwriting, written with a lead pencil, and the spelling is such as would demonstrate that no one had assisted him. We quote a part of that confession:

"Too men got out of the car, one on each side, and work up to our car. They were holding guns in their hands. One was on each side of are car; they stop at the front of the car and looked like they were weating for something. Then the man on Roy's side began to point his gun at him. Roy pulled his gun up to the door and tryed to fire but it did not go off. The man on his side stared to run back to the car. The man on my side point his gun at Roy and before I know it I had my gun on him and fired. He just look at me and said 'My God.' That is when the man with the rafl begin fireing. My gun was a 45 Roy's was a small 32. Mr. Sproat was waking across in front of our car. Roy then get his gun working and fired. I do not thing he shot anyone. The man that I shot crossed the rowd to the other side and fell. We then drove by the other car. My gun I know would not work; the same scell that had been fired was still in it. I thow and gas scell at the man in the front seat and had my gun in my other hand so that he could see it. We then drove down the highway to Tipton and turn North and East. The rowd was slippery and my car turned over and Kile cut his hand on some glass."

John Mercer's only claim is that the case does not present one of planned, malicious, premeditated and deliberate killing.

Let us look at the record.

For months John Mercer and his brother had been committing crimes thruout Pennsylvania, Illinois, Missouri, Indiana, Ohio, and finally, on the morning of August 8, 1930, they reached Iowa and held up a drug store in Davenport. The crimes consisted of larceny, robbery, entering stores, stealing automobiles, and other offenses. Their guns were with them at all times and were loaded, ready for action. They knew no such thing as the law and they cared not about the rights of others. After holding up the drug store they started west on Primary Highway 74, which runs in an easterly and westerly direction. Before they reached Tipton they noticed a car behind them. The three of them then discussed whether they were being followed and got their firearms ready for action. There can be no question they knew when they were stopped that the men who were stopping them were officers of the law. To say otherwise would be like closing our eyes to a self-evident fact. John Carey, the constable, said to them that they looked like the men they were looking for. Hardly had he made that statement when Roy Mercer pointed his gun at him and pulled the trigger, but the gun for some unknown reason (perhaps it was not Carey's time to go) failed to discharge. Then John Mercer, the appellant, fired at Sproat, another officer of the law doing his duty, and Sproat fell dead to the ground.

In the case of State v. Decklotts, 19 Iowa 447, at page 449, Mr. Justice Dillon said:

"That these directions to the jury were applicable to the testimony is not disputed. That they conform to the law as settled in the courts of England, and of this country, requires no elaboration to show. They not only express the law, but they express it with but little verbal, and without essential variation from the language of the accepted authorities and text books in reference to this subject, and in language which, in substance, has been more than once employed in the published judgments of this Court. The State v. Gillick, 7 Iowa 287; 1 Hale, 454; Kel., 64; 1 Russell on Crime, 482.

"The killing, in the case at bar, was by the intentional use of a loaded revolver, discharged into the breast of the deceased. It was entirely correct for the court to state to the jury, that

malice might properly be inferred from the use of such a weapon, unless the circumstances in evidence rebutted such an inference.''

In the case of State v. Zeibart, 40 Iowa 169, 173, 174, the doctrine is further elaborated in this language:

'' 'Malice aforethought may be implied from the kind of weapon used, and the manner and circumstances attending its use, as the place where the wound was inflicted, the strength or severity of the blow given, and if the weapon used was one which, taking into consideration the place where the blow was struck and its evident force would produce a wound which would be likely to result in death, the blow would imply malice aforethought, and if death resulted it would be murder.' This instruction was given by the court, and it is urged that it is erroneous for that 'malice *aforethought*' cannot be implied from any such facts as stated. But the law is well settled that malice is implied from every case of intentional homicide; and this malice so implied must be malice aforethought, because it will sustain a conviction for murder, which requires malice aforethought, unless the accused rebuts the malice, or such negation arises out of the evidence produced against him to prove the homicide and the circumstances attending it. We conclude that the malice implied by the use of a deadly weapon is that malice which will sustain a conviction for murder, and that, as we have seen, is malice aforethought. In other words, the *intent to kill* is inferred from the deliberate, violent use of a deadly weapon, and an intent to kill is malice aforethought.

''1. The following authorities show that the law implies malice from the mere fact of the killing, and it devolves upon the defendant to rebut the presumption in order to reduce the offense from murder to manslaughter: Murphy v. The People, 37 Ill. 447; State v. Brown, 12 Minn. 538 [Gil. 448]; Clarke v. State, 35 Ga. 75; State v. McDonnell, 32 Vt. 491; Hague v. State, 34 Miss. 616; State v. Gillick, 7 Iowa 287; State v. Knight, 43 Me. 11; State v. Johnson, 3 Jones (48 N. C.) 266; Pennsylvania v. McFall, Add. [Pa.] 255.

''2. And the following cases very directly decide that the use of a deadly weapon is evidence of malice aforethought: 1 Wheaton Criminal Law, section 944; Com. v. Drew, 4 Mass. [391] 396; State v. Merrill, 2 Dev. (13 N. C.) 269; Beauchamp v. State, 6 Blackf. [Ind.] 299; Kilpatrick v. Com., 31 Pa. 198; State

v. Decklotts, 19 Iowa 447; Bivens v. State, 6 Eng. (11 Ark.) 455; 1 Greenleaf on Ev., Sec. 14; State v. Gillick, 7 Iowa 287.''

In the case of State v. Woodmansee, 212 Iowa 596, at page 611, 233 N. W. 725, 733, this court said:

'' 'But it is contended that as to the first degree (murder) there was error, because there was no showing of deliberation and premeditation such as would sustain a conviction for that degree of murder. It is well settled that premeditation and deliberation need not exist for any particular length of time before the killing to warrant a conviction for the first degree. State v. Fuller, 125 Iowa 212, 100 N. W. 1114; State v. McPherson, 114 Iowa 492, 87 N. W. 421. * * *

'' 'Where the defendant has selected a deadly weapon, and with opportunity to deliberate has intentionally used it in a deadly manner, it would not, we think, be proper for the court to take the question of deliberation and premeditation from the jury. That under such circumstances it is proper to submit the question of first degree to the jury, although there is no specific proof of deliberation and premeditation, apart from the proof of the violent infliction of a mortal wound, has been affirmed by this court on several occasions.' ''

Again, in State v. Troy, 206 Iowa 859, at page 865, 220 N. W. 95, 98, we announce:

'' 'Premeditation and deliberation need not exist for any particular length of time before the killing, and may be proved by circumstantial evidence.' ''

From the time that John Mercer purchased the deadly weapon and started out to wage his war against organized society, until the death of Sproat, there was in the mind of the accused a fixed purpose to employ that revolver to take human life on the first occasion it appeared to him necessary to do so to carry out his unlawful acts. That thought was translated into action on August 8, 1930, and murder resulted. John Mercer did not act on the spur of the moment. He had been engaged in this life of crime for a long period of time, and he had made up his mind that he would use the revolver at any time that anyone interfered with him. He was waging war against organized society, and when Robert Sproat, an officer of the law, appeared before

him, Mercer did not hesitate to fire at Sproat and take the life of this innocent individual.

It is not easy to say that a man must pay with his life for an offense he has committed. The writer of this opinion has carefully scrutinized every part of the record of this case. There is not a mitigating circumstance. The appellant was represented by distinguished counsel, who have ably presented his cause to this court. We regret that it is our duty to say that John Mercer must pay with his life, but that is the law. It is our hope and prayer that John Mercer will prepare himself to appear before his Maker, and that He who rules over all of us may be merciful to him.—Affirmed.

HAMILTON, C. J., and ANDERSON, KINTZINGER, DONEGAN, PARSONS, RICHARDS, and STIGER, JJ., concur.

SAGER, J., takes no part in this opinion.