STATE OF IOWA, Appellee, v. STEPHEN C. EMERY, Appellant.

No. 46576.

MARCH 6, 1945.

Xen Q. Lindel, of Des Moines, for appellant.

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, and Francis J. Kuble, County Attorney, for appellee.

MILLER, J.—Defendant was indicted for murdering Harry W. Brown by striking him with an iron pipe. He entered a plea of not guilty. The jury returned a verdict of guilty and fixed the penalty at life imprisonment. Defendant filed a motion for new trial, asserting but two grounds therefor, to wit:

"1. That the verdict is not sustained by the evidence in that the State failed to produce sufficient evidence which would convince the ordinary man or woman beyond a reasonable doubt that the defendant had committed the crime as charged.

"2. That the verdict is contrary to law in that the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense and in defense of his person and property."

The motion was overruled and judgment was entered on the verdict. Defendant appeals to this court. But two assignments of error are presented. Each is based on the motion for new trial above quoted. We find no merit in either assignment.

I. The first assignment of error is based on ground 1 of the motion for new trial and asserts that:

"The court erred in not granting the defendant a new trial, in that there was not sufficient evidence generally and no evidence specifically of malice, to justify a conviction of murder of the first degree."

We are satisfied that the issue of malice was for the jury to decide.

The jury was warranted in finding from the evidence the following facts: The fatal injuries were inflicted about 11 p. m., Saturday, March 4, 1944, in an unoccupied WPA tar-paper shack located in an isolated section of Des Moines, near the junction of the Des Moines and Racoon Rivers, on the old city dump. Defendant and Brown were alone in the shack at the time and had been drinking. The nearest dwelling was at least a block and a half away. Brown's body was not discovered until Tuesday afternoon, March 7, 1944. It was just inside the door of the shack, lying on its left side, facing the door, in a large pool of blood. The hair was matted with blood; the clothing was saturated with it, it having run down from decedent's

crushed and battered skull. One trouser pocket was pulled out, and hanging from Brown's vest was a broken watch chain. Brown had left work at 5 p. m. on Saturday, March 4th, with $80 in his possession, wearing a watch and a ring. There was a small amount of change on the body and, in an inside pocket, two $20 bills. The watch was found in defendant's possession and the ring was given by defendant to a "lady friend" with whom he had spent the rest of the night after the killing. Attached to the watch, when found in defendant's possession, was a broken chain which matched that which was found on Brown's vest.

Defendant signed a statement for the police officers and also testified. His testimony is at variance with his signed statement. The statement was given on Friday, March 10, 1944. It recited that defendant and Brown first became acquainted when they were both inmates at Fort Madison penitentiary. They met on the evening of the killing at 7:00 p. m. in a beer tavern, went to another tavern, drank four or five bottles of beer, went to another tavern, drank some more; when they left the latter place, Brown and defendant had a fight but made up and shook hands; they went to various other places, winding up at another tavern where they had something more to drink, might have been whisky; they next went to the WPA shack to finish a bottle of liquor and got into a fight there. Defendant's statement described the fight in these words:

"We got in a fight in there. He hit me two or three times and I hit him two or three times. He just kept coming after me so I picked up an iron. I hit him three or four times with it, the last time I hit him he fell. That is the story. I came back up Second Street. That is where I run into this lady. * * * Well, he said that I had his watch. I said, I haven't got it. I said, search me. He was drunk and I was drunk. He came over to me and that's when the fight started when he started slugging me. He slugged me and I hit him three or four times with my fist. That wouldn't stop him. There was an iron there and I picked it up and gave it to him good, I really did."

Defendant told no one that he had injured Brown, made no effort to secure medical assistance for him; instead he spent

the rest of the night frequenting various resorts with his "lady friend" and eventually went to bed with her. On the witness stand defendant testified:

"From the time I left the shack until I was arrested I never told anybody that I had left an injured man in the shack. I never made any inquiry or tried to find out what had become of Harry Brown." And again: "I never tried to find out the extent of the injuries I inflicted on Harry Brown."

The "iron," with which defendant struck Brown, was a piece of one-inch gas pipe approximately eighteen inches long. Defendant carried it away from the shack after the fight and later found it for police officers. It was introduced in evidence as Exhibit 12. Dr. Shaw, the coroner and a physician, testified:

"The injuries to the man's skull were largely confined to the right side of the skull. He had a depressed fracture of the right temporal parietal bone and of the occipital bone. The temporal bone and the parietal bone are the bones at the side of the skull, the occipital bone constitutes the back of the skull extending around to the side and joining the temporal and parietal bone. The skull was crushed rather than a simple fracture. The wounds were confined to the right side and extended into the back of the skull and the occipital bone. * * * The skull had been so mutilated, the fracture so depressed, that there was a fatal damage to the brain itself. It appeared to me that some blunt instrument must have been used to crush this skull. The nature of the injuries led me to believe that repeated blows had been struck. It was obvious that all the blows were very hard. Exhibit '12' is such an instrument as might have been used in crushing the skull of the body that I examined. If Exhibit '12' were used it is my conclusion that the skull had been struck a number of heavy blows with it."

There was a great deal more evidence, of course, but the foregoing should suffice for the purpose of showing that the jury was warranted in finding that defendant acted with malice in killing Brown. In State v. Burris, 198 Iowa 1156, 1158, 1159, 198 N. W. 82, 84, we stated:

"2. In Instruction No. 12, the court said:

" 'Malice, as used in the indictment and these instructions, means that condition of the mind which prompts one to do a wrongful act intentionally, without legal justification or excuse. It does not mean mere spite, hatred, or ill will, but does signify that state of disposition which shows a heart regardless of human life. This character of malice may be presumed from the intentional use of a deadly weapon in a manner likely to inflict great bodily injury or death.'

"Appellant challenges the first of the quoted sentences. The objection is not well taken. The definition given by the court is identical in language with an oft repeated definition of malice in cases of homicide which has stood the test of time and repeated attacks. The definition evidently originated in Bromage v. Prosser, 107 Eng. Reprint 1051, decided in 1825. It has been repeated in a very large number of cases that have met with the approval of the English and American courts of last resort. See 5 Words & Phrases 4298, 4300, 4301; 29 Corpus Juris 1084, 1085, and many cases cited. We have held that it is not erroneous. State v. Decklotts, 19 Iowa 447; State v. Klute, 160 Iowa 170.

"The last sentence of the instruction is likewise criticized. It is the uniform and general holding, in cases of homicide, that malice may be presumed from the intentional use of a deadly weapon in a deadly and dangerous manner. State v. Zeibart, 40 Iowa 169; State v. Townsend, 66 Iowa 741; State v. Hockett, 70 Iowa 442; State v. Hayden, 131 Iowa 1; State v. Brown, 152 Iowa 427; State v. Teale, 154 Iowa 677.''

In the case of State v. Brown, 67 Iowa 289, 291, 25 N. W. 248, 249, we stated:

"The revolvers were, of course, deadly weapons; but it is said the stick was not; but we cannot so say as a matter of law. This, we think, was a question for the jury. An instrument may or may not be a deadly weapon, depending on the manner in which it is used. It is probable that a riding-whip should not be so regarded. A base-ball bat, if viciously used, probably should be. We think death might be caused by the use of the

stick with which the assault was made in this instance. The jury might well so conclude from all the circumstances in the case. We cannot interfere with the verdict.''

In State v. Sullivan, 230 Iowa 817, 820, 298 N. W. 884, 886, we stated:

''Sullivan insisted that he did not intend to kill Hart, he only intended to wound him or make him lie down so that Haenze could open the gate. However, we must bear in mind that, when as here one deliberately and wantonly opens fire upon another human being with a deadly weapon and with intent to wound that person, the law holds him to the consequences of such act. If the victim is fatally wounded, the law presumes malice and the intent to kill. Under such a state of facts, a conviction of murder in the first degree is warranted. Section 12911, Code, 1939; State v. Mercer, 223 Iowa 1134, 274 N. W. 888; State v. Heinz, 223 Iowa 1241, 1258, 275 N. W. 10, 114 A. L. R. 959; State v. Berlovich, 220 Iowa 1288, 1292, 263 N. W. 853; State v. Matheson, 220 Iowa 132, 137, 261 N. W. 787; State v. Pinkerton, 201 Iowa 940, 946, 208 N. W. 351; State v. Burris, 198 Iowa 1156; 198 N. W. 82.''

Applying the foregoing pronouncements to the record herein reviewed, we are satisfied that the jury was warranted in finding that defendant acted with malice herein. Defendant's counsel contends that defendant and Brown were men who were used to fighting and that they could be expected to fight quite viciously without being malicious. The argument might be persuasive to a jury, but it does not seem to be appropriate here. The law is the same for all persons. We see no reason for requiring a different application of it to defendant herein.

II. The second assignment of error is based on ground 2 of the motion for new trial and asserts that:

''The court erred in not granting the defendant a new trial in that there was not sufficient evidence to prove beyond a reasonable doubt that the defendant did not act in self-defense.''

The State concedes that it had the burden of proving beyond a reasonable doubt that defendant did not act in self-defense, but

contends that it met such burden so that it was for the jury to decide. We agree with the State.

In the recent case of State v. Sedig, 235 Iowa 609, 614, 16 N. W. 2d 247, 250, we stated:

''I. There are four recognized elements of self-defense in justification for a homicide: (1) The slayer must not be the aggressor in provoking or continuing the difficulty that results in the killing. (2) As a general rule he must retreat as far as he reasonably and safely can before taking his adversary's life. (3) He must actually and honestly believe he is in imminent danger of death, great bodily harm, or some felony, and that it is necessary to kill in order to save himself therefrom. (4) He must have reasonable grounds for such belief. State v. Johnson, 223 Iowa 962, 967, 274 N. W. 41; 40 C. J. S. 983, 984, section 114; 26 Am. Jur. 241, 242, section 126.''

The jury was warranted in finding that defendant, rather than Brown, was the aggressor. Defendant stated to the police that the fight started over Brown's accusing defendant of having Brown's watch. Defendant gave inconsistent stories about how he came into possession of Brown's watch. One story was that he bought it of Brown for $5. Another was that he found the watch. But the jury could have found that the watch chain was broken when defendant took the watch from Brown. If they found that he took it from Brown before the fight and that that caused the fight they would be justified in finding that Brown was not the aggressor. There was also a jury question whether defendant made any retreat before taking Brown's life. Likewise, it was a jury question whether defendant honestly believed that Brown, whom he had engaged in a fist fight earlier in the evening, was about to place defendant in imminent danger of death or great bodily harm when he attacked defendant bare handed. Finally, it was a jury question whether defendant had reasonable grounds for such a belief.

Since we find no merit in either assignment of error, the judgment is—Affirmed.

All JUSTICES concur.