STATE OF IOWA, Appellee, v. LESTER Moss, Appellant.

**MALICIOUS MISCHIEF:** Evidence — Sufficiency. Evidence re-
1 viewed, and held sufficient to justify the jury in finding that the accused, and not a third party, was guilty of the act charged.

**MALICIOUS MISCHIEF:** Elements—Injury to Dwelling House—
2 Terrorizing Inhabitants. Malice is a necessary element of the act of injuring a dwelling house and terrorizing the inhabitants thereof, as defined in Sec. 4799, Code, 1897, and such element may be shown by evidence which enlightens the jury as to former difficulties, etc., between the accused and the injured party.

**CRIMINAL LAW:** Instructions—Circumstantial Evidence. It is
3 not necessarily error for the court to tell the jury that guilt is generally shown by circumstantial evidence. Instruction reviewed, and held not to disparage defendant's direct denial of guilt.

CRIMINAL LAW: Conduct of Counsel—Asking Objectionable Ques-
4   tions. Prejudicial error does not necessarily result from the
mere asking of an objectionable question, without intent or pur-
pose to insinuate prejudice against the accused.

WITNESSES: Impeachment — Character Witness—Cross-Examina-
5   tion. A good-character witness may, on cross-examination, be
asked if he has not heard certain disparaging reports concern-
ing the one whose reputation he has testified was good.

CRIMINAL LAW: Conduct of Counsel—Argument Aside Record.
6   Argument reviewed, as to remarks alleged to be outside the rec-
ord, and, in view of the withdrawal of the statement, held not
to justify a presumption of prejudice.

*Appeal from Guthrie District Court.*—W. H. FAHEY, Judge.

JUNE 24, 1918.

REHEARING DENIED JANUARY 15, 1919.

THE defendant was convicted of the crime of shooting
with a gun at a dwelling, with intent to injure or deface the
same, and appeals.—*Affirmed.*

*Gwin & Garber* and *A. M. Fagan,* for appellant.

*H. M. Havner,* Attorney General, for appellee.

LADD, J.—I. The accused lived with his parents on a
farm, about a mile and a half west of Guthrie Center. He
worked that farm. Their house is near the highway, and
on the south side of the division line be-

1. MALICIOUS
MISCHIEF:
evidence: suf-
ficiency.

tween such farm and that of J. H. Shroy-
er and family, the house of whom is a con-
siderable distance from the road. At about
7:30 o'clock in the evening of April 22, 1916, the Shroyers
left their house, with lamp burning, for Guthrie Center.
Both testified that, in passing the Moss home, they observed
the accused looking out of the window toward their house.
Upon their return, the lamp was still burning; but some-
body had fired 11 bullets through the south window. 3

through the west window, and 6 in the end of the house. Glass from the window, leaves from house plants, slivers of wood from the window sash, and several bullets, were found on the floor. Appellant contends that the evidence was insufficient to warrant his conviction. Near an apple tree, about 200 feet southeast of the house, and on the premises of Moss, 14 empty shells were found. Twigs on plum bushes, in line from this tree to the house, showed bullet marks, and near them two empty 22-caliber shells and one loaded shell were found. In short, the evidence was such as to have warranted the conclusion that at least 14 shots were fired from near to or beneath the apple tree. All the shells appear to have been what is known as "22 shorts." Defendant owned a 22-caliber rifle, and, on the following morning, the sheriff, Boots, examined this rifle, which was a repeater. Defendant informed him it "would hold 18 shorts." The sheriff fired it six times, and thereby obtained that number of empty shells, and testified that:

"If you would mix the shells up that I got, and those that I found at the apple tree, you could not tell them apart; and, in my estimation, the mark of the firing pin was identical. * * * The mark that firing pin on the 22 rifle would make on the cartridge would not be the same in all makes of guns. Some have round firing pins and some a triangle, and some have a square, or a little narrower, or oblong. There are a great many different makes of guns, and there would probably be some of them pretty near alike; and in the same make of gun, the firing pin would make the same mark. I don't hardly think there are a number of different makes of guns that have the same shape of firing pin."

These shells, as well as the 14 found under the tree, were introduced in evidence. Other evidence was adduced. Doubt as to the identification of the pin mark was raised by other evidence. An employee testified that he left the

house at about 7:30 o'clock; and that only he and the defendant made use of this gun; and that defendant had said that he "had quite a bit of ammunition;" and that he thought it consisted of "22 shorts." The parents of defendant denied that they had ever used the gun, and his brother, four years older, was in Montana at the time of the trial, though at home on the evening in question. The evidence tended to show that the defendant and the Shroyers had several difficulties, and that there had been considerable feeling between the families, especially the defendant and Shroyer and wife, for several years; that the accused had manifested a disposition to do them physical violence, on several occasions; as, having fired his rifle in front of Shroyer's team when passing, having discharged a bullet into the windmill on their premises, and having addressed both Mr. and Mrs. Shroyer with violent and obscene language. That someone fired the bullets with defendant's gun into the Shroyer house might well have been found by the jury. Who was that person? The defendant contends that the evidence was insufficient to identify him.

As seen by the process of elimination, either he or his brother Harold might have been found to have been the offender,—but which one? The gun and ammunition belonged to the defendant. Patterson testified that, during the 5 or 6 weeks of his employment there, only defendant and the witness used the gun. The defendant, not Harold, worked the farm. The occupation of the latter was that of school teacher, and, in so far as the record discloses, he had not participated in the troubles, save by assisting defendant, at one time, in repairing a fence, and had manifested no ill feeling toward the Shroyers,—was apparently without motive. These circumstances were sufficient to carry to the jury the issue as to whether defendant, rather than Harold, did the shooting. The facts of the case distinguish the holding from those in *State v. Johnson*, 19 Iowa 230; *State*

*v. Clifford,* 86 Iowa 550; and *State v. Saling,* 177 Iowa 552. The evidence was such as to preclude interference with the verdict.

II.   The indictment charged the offense defined by Section 4799 of the Code, declaring that:

"If any person, with intent to injure or terrorize the inhabitants of any dwelling house * * * or 2. MALICIOUS MISCHIEF: elements: injury to dwelling house: terrorizing inhabitants. with intent to injure or deface any such structure * * * shoots thereat, with such intent, any gun, pistol or revolver," he shall be punished accordingly.

Considerable evidence of trouble between these families over the care of chickens and the like was received in evidence over objection, as tending to show motive on the part of the defendant. Error is sought to be predicated on the proposition that, inasmuch as malice is not designated in the definition of the crime, such evidence was not admissible. Though the evidence was introduced to establish motive, rather than malice, it may well be said that an intent, such as described in this statute, involves malice; for how else than maliciously might one entertain an intent to injure or terrorize? The evil purpose is an essential ingredient, and proper to be shown.

III.   The seventh paragraph of the charge was in the language following:

"In no case is it necessary, in order to establish the crime charged, that there should be direct 3. CRIMINAL LAW: instructions: circumstantial evidence. proof of his guilt by eyewitnesses, who were present and saw him commit the crime, but in criminal as well as civil cases, the evidence may be, and frequently is, not direct, but circumstantial; in fact, in criminal cases, the guilt of the defendant, if shown at all, is most generally shown by the latter

kind of evidence; that is, by the proof of such facts and circumstances as establishes the guilt of the defendant. And when the evidence in a case consists of a chain of well authenticated and proven circumstances, it is often more convincing and satisfactory, and gives a stronger ground of assurance of the defendant's guilt, than the direct testimony of witnesses, unconfirmed by circumstances. But to justify the inference of guilt from circumstantial evidence, the facts proven, from which it is asked that the guilt of the defendant be inferred, must be consistent with each other, and must not only clearly point to his guilt, but must be inconsistent with any other reasonable hypothesis upon which his innocence may be maintained. And where the prosecution relies upon circumstantial evidence alone to establish the conviction of a person of a crime charged, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the crime charged has been committed by someone in the manner and form as charged in the indictment; and further, that all the circumstances proven are consistent with defendant having committed the crime; and that the facts and circumstances proven are such as to be inconsistent with any other rational conclusion than that the defendant is the person who committed said act."

Exception is taken to that part of the instruction saying that, "in criminal cases, the guilt of the defendant, if shown at all, is most generally shown by the latter kind of evidence" (circumstantial). The language following that quoted also is criticised, for that, as is said, it discriminates in favor of circumstantial evidence, as compared with direct evidence, to defendant's prejudice, as he testified directly in denial of his guilt. The instruction purports to deal solely with evidence tending to show guilt, and none other than circumstantial evidence was adduced by the State. The jury was merely told that circumstantial evidence is often more conclusive than direct evidence,—and,

of course, this, as well as the contrary, often is true; but from the saying of this it is not to be inferred that the one class of evidence is more reliable than the other. The language could not well have been so construed, but it was well calculated to advise jurors that circumstantial evidence might not be rejected as unreliable. What follows in the instruction obviates any deduction that reference was had to defendant's denial of having committed the offense. One accused of crime can do little else than deny, save by proving circumstances which, when considered in connection therewith, tend to exculpate him from the charge. The instruction was not open to the criticism of the one reviewed in *State v. Crofford,* 121 Iowa 395, but, in the light of the evidence adduced, was without error.

IV. Complaint is made that the county attorney, in questioning witnesses, propounded questions insinuating the commission of other offenses by the accused, and, in argument to the jury, traveled outside the record.

4. CRIMINAL LAW: conduct of counsel: asking objectionable questions.

Several questions relating to the conduct of defendant toward the Shroyers were asked; but, as these were not persisted in, nor asked merely for the purpose of insinuating prejudice against him before the jury, the mere asking ought not to be denounced as prejudicial error. Other questions complained of were put in the cross-examination of witnesses who had testified that defendant's moral character was good. As these questions related to what the witness had heard concerning the accused, they were within the bounds of propriety. As some of these witnesses had heard disparaging reports concerning defendant, it ought not to be assumed that the inquiries were not made in good faith. The facts were not sought to be shown, but merely what the witnesses had heard said of him whom

5. WITNESSES: impeachment: character witness: cross-examination.

they had sworn to have possessed a good moral character. There was no prejudice. *State v. Kimes,* 152 Iowa 240.

In the closing argument, the attorney for the State referred to the defendant as having been twice acquitted in justice court of alleged offenses by the testimony of his folks; but, upon objection interposed, he

6. CRIMINAL LAW: conduct of counsel: argument aside record.

withdrew his statement as to two such acquittals, and said that the matter had been mentioned inadvertently. Counsel for the defendant insisted that there was no such evidence; but the record was otherwise as to there having been one acquittal. Some talk between the court and counsel for defendant as to whether there were two acquittals followed. The county attorney suggested that, as "his folks" were present, it might be assumed that they had testified. The court thereupon remarked that the jury would remember what the testimony was, and added, "It is not the province of the county attorney to tell you what the testimony is;" and the argument proceeded. As nothing further appears, it may be assumed that the controversy ended here. No prejudice is to be inferred. The statement as to two acquittals was withdrawn, and nothing was claimed as to "the folks," further than that they had testified concerning some charge in justice court,—merely an incidental matter; and that was left to the memory of the jury.

We discover no error, and the judgment of conviction the light is so arranged that it shoots up more than 42

PRESTON, C. J., EVANS and SALINGER, JJ., concur.