STATE OF IOWA, Appellee, v. GEORGE SOLOMON, Appellant.

**HOMICIDE:** Corpus Delicti—Circumstantial Evidence. Criminal homi-
1  cide may be proved by circumstantial evidence. Evidence held to show that death was the result of criminal violence, rather than of fire accidentally communicated to the clothing of deceased.

**CRIMINAL LAW:** New Trial—Misconduct of Prosecutor—Argument in
2  Re Undisputed Facts. The inhibition against making reference to the defendant's failure to testify is not violated by the act of the public prosecutor in asserting in argument that certain facts are undisputed, even though the accused is the only person who could dispute them.

Headnote 1:   30 C. J. pp. 285, 287.   Headnote 2:   16 C. J. pp. 896, 903, 904.

Headnote 1:   13 R. C. L. 738.   Headnote 2:   2 R. C. L. 428.

*Appeal from Woodbury District Court.*—ROBERT H. MUNGER, Judge.

OCTOBER 26, 1926.

REHEARING DENIED APRIL 7, 1927.

The defendant was indicted, tried, and convicted in the court below of the crime of murder. From a judgment sentencing him to the penitentiary for life, he appeals.—*Affirmed.*

*Everett Waller* and *O. D. Nickle,* for appellant.

*Ben. J. Gibson,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, and *O. T. Naglestad,* County Attorney, for appellee.

STEVENS, J.—The indictment in this case charges the defendant with the crime of murder in the first degree. It is the claim of the State that he assaulted, and in some way inflicted

1. HOMICIDE: corpus delicti: circumstantial evidence.

severe injuries upon his wife, and then thrust the trunk of her body into the ash pit of the furnace in the basement of his home, and dumped the fire upon her face and body until it was severely burned. Whether viewed from the standpoint of the prosecution or of the defendant, the tragedy was a gruesome one, and the conduct of the defendant repulsive and brutal in the extreme.

The family of the defendant consisted of himself, the deceased, and nine children,—seven sons and two daughters,—all of whom resided at the home at 1308 Court Street, Sioux City. The tragedy occurred sometime in the forenoon of February 3, 1926. Russell and Mary Solomon, aged 14 and 12 years, respectively, testified that they went to school in the morning of the day in question, and returned about 12:30. They attended different schools, and Russell was the first to arrive home for dinner. The lunch was prepared by the defendant, and served in the kitchen. The children inquired for their mother, and were informed by the defendant that she had gone down town. They repeated the inquiry when they returned home from school, and were again informed that their mother had not yet returned. Clarence testified that he talked with his mother about 11:15, requesting her to lay out some clothing for him which he desired to put on when he came home. She complied with his request. Maurice, who was 23 years of age, came home early in the evening, and, discovering the absence of his mother, inquired of the defendant where she was. The defendant told him that she had been burned, and was in the basement. The father and son went immediately to the basement, and found the body lying upon a pile of rags in the fruit room, completely covered up with clothing and other rags. Maurice then immediately, which was approximately 7 o'clock in the evening, telephoned Dr. Keeffe, tell-

ing him that his mother was dead, and requesting him to come at once. When Dr. Keeffe arrived, he found the body in the fruit room, covered as above stated. A light was obtained, and he observed the condition of the body above the waistline. He testified that she had been dead eight or ten hours. The coroner and several police officers were called, and the body removed to the undertaking rooms. Subsequent examination of the body by the coroner and others disclosed that the right wrist was fractured; that the skin on one knee was torn loose; that there were blood clots under the scalp in the back part of the head; that there was a depression in the skin on the forehead, which looked as though she might have been struck with some instrument. The hair was burned off the head; the face and breasts and other parts of the body above the navel were charred, and the arms were severely burned; all of the clothing worn by her approximately above the waistline was completely consumed by fire, except that about eight inches of her dress sleeves were discovered in a basket of ashes in the basement. There were also some hairpins and a bundle of false hair in the ashes. The clothing removed from the body consisted of a house dress, a black skirt, and a suit of fleece-lined underclothing, removed, as above stated, and a pair of hose. She had on no shoes. The burned portion of the body was marked by a definite line across her body a little above the navel. Medical experts examined on behalf of the State testified that death was probably due to asphyxiation resulting from the burns.

The explanation offered by the defendant to his family, Dr. Keeffe, and the officers was that he was sleeping, and, awakened around 11 o'clock by the smell of smoke, he went to the basement, and found his wife lying on the floor in front of the furnace, with the furnace door open, her body burned, as described; that he threw water upon her clothing, put the fire out, and carried the body into the fruit room, laid it on some rags, and covered it up as it was when viewed by Maurice and the doctor in the evening. Defendant gave as his reason for not informing the children of the death of their mother when they returned from school at noon that he did not want to worry them, and he stated that he did not call the officers because he did not want to bother them. He said that he did not call his son Maurice, who was manager of a grocery store in Sioux City, as he could

not hear well over the telephone. He did not, in any statement made by him, claim to have heard screams or any outcry from the basement. There were no marks upon the back of the deceased. Here hands were burned, but not so badly as her body.

Two propositions upon which a reversal is asked are urged by appellant: (a) That the State failed to prove the *corpus delicti*; and (b) that the evidence is insufficient to convict the defendant.

As already appears, the evidence introduced by the State to prove the *corpus delicti* and the commission of the crime by the defendant was largely circumstantial. That the same may be so proven is well settled in this state. *State v. Kelley*, 193 Iowa 62; *State v. Grba*, 196 Iowa 241; *State v. Townsend*, 191 Iowa 362.

First, as to the *corpus delicti*. The theory of the defendant that the clothing of the deceased was set on fire by a puff or blaze from the furnace when the door was opened by her is, it seems to us, overcome by every rational fact and hypothesis of the case. An examination of the furnace made on the evening of the tragedy disclosed that strings of soot several inches in length were hanging in front of, and adjacent to, the upper furnace door. A puff of the furnace sufficient to carry a blaze to the clothing of the deceased would probably have blown away these strings of soot. While several hours elapsed after the tragedy and before the clothing was removed by the coroner, it was not damp, nor was there any indication upon the floor of the basement that water had been poured upon the body, as claimed by the defendant. The ashes were all removed from the furnace and dumped into a bucket, in which the pieces of the dress sleeves and the false hair were found. One of the sons requested the doctor, when he arrived, to watch the actions of his father, and said to one of the police officers, in reply to an inquiry, that he "thought Dad did it." The admission of this testimony is not complained of. He further stated that his father and mother had quarreled, a few days before. The removal of the body to the fruit room and its concealment in the manner stated are so utterly inconsistent with every instinct of humanity that it is next to impossible to believe that any husband who was innocent could be so brutal as to thus dispose of the body of his deceased wife immediately after she had met death in the hor-

rible manner indicated. It is unbelievable that he would not have called a physician, or that he would have lied to his children about it and gone about the affairs of the household in a manner not to attract the attention or arouse the suspicion of the children. Mary testified that she went to the basement to feed some kittens, and that she neither saw nor observed anything out of the ordinary, except that she closed a basement window. She did not go into the fruit room. The clothing worn by the deceased at the time would have been consumed quickly, and would not have charred the body. Ashes and cinders were found in the right hand, in the ears, upon the body, and particularly at the elbow of the deceased. The ashes, and particularly the cinders, could not have come from the burned clothing. The portion of the body showing that the burns extended to a well defined line just above the navel is a circumstance entitled to great weight, as tending to show that the body was thrust into the furnace. The clothing below the waistline was not burned.

The further affirmative contention of appellant is that the opening into the ash box of the furnace was not sufficient to admit the body. The deceased was a small, frail woman, 14 inches between the shoulders, 5 feet, 1 inch in height, and weighing about 100 pounds. Measurements taken of the furnace by a nephew of the defendant's disclosed that the door of the ash pit is 19 inches wide by 12 inches in height; that the distance from the floor of the ash pit to the grates was 7¾ inches; that it is 17½ inches from the front door to where the ashes are discharged from the fire box, and 34 inches from the front door to the extreme back of the pit. The space between the grates and the bottom of the ash pit is, according to this measurement, very narrow. Other witnesses testified that they observed the size of the door and opening beneath the grates, and that in their opinion the body could easily have been inserted into the ash pit. The jury was permitted to view the furnace, at the request of the defendant and with the consent of the county attorney. None of the theories of appellant can reasonably account for the broken wrist and the injuries upon the knee and the head of the deceased. It is, of course, possible, as testified to by one of the medical witnesses, that a sudden puff from the furnace directly in the face might produce strangulation and cause the injured person to throw her arms in an effort to breathe, and that the

deceased might have struck the furnace door, causing the injuries stated. The theory has little to support it, especially in the light of all that the defendant did.

The defendant, according to his naturalization papers,— which is about all that is known about it,—was 73 years of age at the time of the tragedy. His nationality is not disclosed by the record, but it was stated in oral argument that he is a Syrian. He was for 20 or 25 years engaged in the confectionery business at Albert Lea, Minnesota, retiring and moving to Sioux City 5 or 6 years prior to February 3, 1926.

The conduct of the defendant was such as to make it difficult to consider the facts and circumstances with a due appreciation of his claims of innocence. It is impossible to reconcile his conduct with any rational theory or hypothesis of innocence. If a crime was committed, he alone is guilty thereof. Just what the motive may have been, is not disclosed by direct evidence; but proof of motive is not essential to conviction. If the commission of the crime alleged is otherwise established by the requisite proof, that is **sufficient.**

It is urged by his counsel that the circumstances must be of such a character and the proof thereof so indubitable as to **exclude** every other rational hypothesis except that of guilt. Accepting this as the rule, it seems to us that the circumstances fully meet its requirements. There is no doubt in the minds of the members of this court that the defendant deliberately took the life of his wife, either by a blow upon her head or by placing the trunk of her body in the furnace and dumping the fire upon it; causing strangulation. The deceased was stunned or unconscious from some other cause when her body was placed in the furnace, as she evidently made no resistance. It is conceded by appellant that proper instructions were given to the jury; and the two propositions above discussed, together with the contention that there was misconduct on the part of the county attorney in argument to the jury, constitute the only matters relied upon 2. CRIMINAL LAW: for reversal. The exact point urged is that the new trial: misconduct of prosecutor: argument *in re* undisputed facts. county attorney referred to the failure of the defendant to testify in his own behalf. We shall not set out the language complained of, but suffice it to say that it did not violate the statute. It is not improper for the county attorney to call the jury's attention to the fact

that certain evidence is not contradicted, although the defendant alone might do so. *State v. Hasty,* 121 Iowa 507; *State v. Riley,* 177 Iowa 313; *State v. Gibson,* 199 Iowa 177. The argument complained of, in effect, goes no further than to call attention to certain testimony which was uncontradicted by any witness. Moreover, no proper record of the alleged misconduct appears to have been preserved.

The judgment of the court is affirmed.—*Affirmed.*

DE GRAFF, C. J., and FAVILLE and VERMILION, JJ., concur.