STATE OF IOWA, Appellee, v. JACOB LUTHER MANLY, Appellant.

No. 40510.

NOVEMBER 18, 1930.

REHEARING DENIED FEBRUARY 12, 1931.

*C. A. Pratt* and *McCoy & Beecher,* for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-General, and *John W. Gwynne,* County Attorney, for appellee.

KINDIG, J.—On April 2, 1930, a county attorney's information was presented and filed in the Black Hawk County district court, charging the defendant-appellant, Jacob Luther Manly, with the larceny of certain hogs, committed March 6, 1930, in the aforesaid county. Likewise, that information alleged that the appellant previously had been twice convicted of felonies, as follows: Breaking and entering a building, April 3, 1922; and grand larceny, May 21, 1926. There is no serious dispute here concerning the previous convictions. It is shown by the record that the appellant, prior to the present proceeding, had been twice convicted of felonies.

A reversal of the judgment in the district court, however, is asked by appellant because: First, the State has not proven his guilt of the offense now charged; and second, evidence was improperly admitted, and the jury wrongfully instructed by the district court. These disputed subjects will now receive consideration.

I. First, it is contended by the appellant that the State has failed to prove the larceny of the hogs: that is to say, appellant claims that, under the record, the hogs may have been

 lost, but there is no competent evidence that the missing animals were taken from their owner through larceny. After reviewing the record, however, we are convinced that there was substantial evidence before the jury upon which that body could conclude, if so persuaded, that the hogs in question, as charged in the county attorney's information, were taken from the owner through larceny. Lloyd Lamb, a stock buyer, who lived in LaPorte City, owned 84 hogs. Those animals were kept by the owner in a secure pen at the stockyards in that place during the latter days of February and the first days of March, 1930. Mr. Lamb counted these hogs on Wednesday morning, March 5th, and separated two cripples from the herd. Thereafter, he was through and near the pens all day, the following Thursday. Then, on the succeeding Friday morning, March 7th, while counting the hogs, Mr. Lamb found only 62 remaining, which, together with the two cripples, made a total of 64 hogs. Thus it appears that 20 of the animals were missing. While Mr. Lamb did not see a thief actually steal the hogs, yet he testified during the trial that he did not sell the 20 missing hogs, nor did this owner, according to his testimony, give them away or take any out of the pen. Moreover, such owner further testified that the hogs which had disappeared were not taken with his permission or consent. Under that record, the jury were warranted in finding that larceny had been committed. In other words, the jury were justified, if they so elected, in finding that the hogs in question were stolen by someone. *State v. Rodman*, 62 Iowa 456. Therein we said:

"It is insisted that the evidence fails to support the verdict, in that it is not shown that the horse in question [the one involved in the larceny] was stolen. The evidence shows that the horse was put in a stable at night, and the next morning was gone. Counsel insist that, as the evidence fails to show that the animal was secured in the stable, it might have escaped. The evidence, as counsel argue, fails in not showing that the horse was in some manner 'fastened in the stable.' The evidence shows, *prima facie* at least, that the animal was stolen."

Circumstantial evidence may be sufficient to establish the *corpus delicti*. *State v. Solomon*, 203 Iowa 954. Hence, under

all the record, appellant was not entitled to a directed verdict on the theory that there was no proof of the *corpus delicti*.

II. But appellant says that, even though the hogs were stolen, the State has not proven him to be the guilty party. Such statement is made, not upon the theory that the State furnished  no testimony to substantiate appellant's conviction, but rather, because whatever proof was presented consists of weak and insufficient evidence. So he contends that, because of the whole record's insufficiency, this court can set aside the jury's verdict. A more liberal rule is applied to a criminal than to a civil case, in setting aside the jury's verdict; for it is true that this court will interfere more readily with the verdict in a criminal proceeding, where the same is contrary to the evidence, than in a civil action, under the same circumstances. *State v. McKenzie,* 204 Iowa 833.

On the other hand, if there is substantial and sufficient evidence supporting the jury's finding that the appellant did commit the larceny, this court will not interfere with the verdict. To put the thought in another way, this court will not substitute its judgment concerning the weight of the evidence for that of the jury. Nevertheless, if it is deemed by the court that the verdict is not supported by the entire record, then the jury's finding may be set aside. *State v. Glendening,* 205 Iowa 1043; *State v. Cordaro,* 206 Iowa 347.

Tested by those underlying principles, the sufficiency of the evidence presented will now be considered. Among the 20 hogs stolen, there was one, or more, blue in color. This color is brought about by a cross between a Hampshire and a white hog. They are rare and extraordinary in color. Other hogs among the 20 were red "mangy." Also, the stolen herd included, in addition to the others, black and white animals. Mr. Jahnke, a stock buyer, inspected Lamb's hogs at LaPorte City about February 27th, previous to the larceny. Upon that occasion, Mr. Jahnke noticed the blue hogs, as well as those which were red "mangy." He observed the size and the weight. J. E. O'Connor was buying hogs at Readlyn for Mr. Jahnke. While O'Connor was out in the country, presumably on a hog-buying trip, Jahnke, on March 6th or 7th, went to the stockyards at Readlyn, and there observed the blue hogs, as well as the red

"mangy" animals, together with the others, colored black and white. Their size and weight closely coincided with those of the hogs seen in Mr. Lamb's possession at LaPorte City the previous February 27th. So striking was the identification of these hogs that Mr. Jahnke recognized them as being the ones previously seen in Mr. Lamb's yards at LaPorte City.

Nothing, however, was said by Jahnke to Lamb concerning this, because the former did not know at that time that the hogs were stolen. Not understanding that the animals had come to his yards at Readlyn through theft, Jahnke shipped them to Chicago, before he learned of Mr. Lamb's loss. After learning of the larceny, Jahnke and Lamb instituted an investigation, and discovered that the 20 hogs came to the stockyards at Readlyn through someone purporting to be E. C. Johnson. O'Connor, acting for Jahnke, gave such E. C. Johnson a check, in payment for the hogs. According to O'Connor, the hogs were delivered at 4 o'clock in the afternoon of March 6th. Whoever sold those hogs to Jahnke through O'Connor is alleged by the latter to have inquired concerning the market for such hogs about two days before the delivery. It is alleged by O'Connor that he knew Johnson, and he identified him as the man who delivered the hogs and received the check therefor. The man pretending to be Johnson had previously sold hogs to O'Connor. At the time the animals in question were delivered, it seems that O'Connor had no blank checks at the stockyards, and asked Johnson to call at the former's home that night, in order that the check might be written upon blanks kept at the home. For the purpose of obtaining the desired check, Johnson went to O'Connor's home March 7th, and received the check from the former. When at the O'Connor home, Johnson was seen by William O'Connor, aged 13, son of the stock buyer.

Although Jahnke's stock buyer refused to identify Johnson as the appellant, Manly, yet he said there was a resemblance, except that Johnson "is a light-haired man." By inference, we assume that Manly had dark hair. Continuing, O'Connor, the stock buyer, said that Johnson and appellant were of the "same general appearance." William O'Connor, however, the son, testified that the man who came to their house on the night of March 7th to receive the check was one and the same person as the appellant. Likewise, William said that the man who

came after the check had dark hair. During his cross-examination, William receded somewhat from his positive identification, and stated: "I would not want to swear that the man who was there [at the O'Connor house after the check] that night was Manly, but I am quite sure." Furthermore, on redirect examination, the boy declared: "I am quite sure this man Manly is the man Johnson who was at my father's house that night."

There is another circumstance which strongly corroborates William O'Connor in his identification of appellant. Following the receipt of the check by the man purporting to be E. C. Johnson, the name "E. C. Johnson" was indorsed on the back thereof by someone, and the indorsed instrument was presented by the so-called Johnson for payment to one Mutch, an oil station attendant at Waterloo. Mutch denied that appellant cashed the check, but said that E. C. Johnson in fact obtained the money thereon. Notwithstanding Mutch's denial that appellant was the man who cashed the check, a handwriting expert was called, who, after qualifying as such, testified that the "E. C. Johnson" indorsed upon the instrument was in the handwriting of appellant. Such conclusion was reached by the expert witness after comparing that indorsement with the admitted handwriting of appellant. Apparently the State was surprised at the testimony of its witness Mutch. That is obvious from an inspection of the record.

Appellant seeks to minimize the value of the evidence given by the handwriting expert. While so doing, the appellant asserts that the testimony of such expert is of the lowest value,  and as a basis for this depreciation of the State's evidence in this regard, he refers to the following authorities: *Borland v. Walrath,* 33 Iowa 130; *Whitaker v. Parker,* 42 Iowa 585; *Browning v. Gosnell,* 91 Iowa 448; *Jackson v. Adams,* 100 Iowa 163; *Ayrhart v. Wilhelmy,* 135 Iowa 290. Even if we concede, without deciding, or redeclaring, that the testimony of handwriting experts is not the highest in value, yet, under proper circumstances, it does have probative force. Section 11278 of the 1927 Code provides:

"Evidence respecting handwriting may be given by experts, by comparison * * * with writings of the same person which are proved to be genuine."

No direct denial is made by anyone that the indorsement on the note was in appellant's handwriting. Upon many occasions, this court has given value to the testimony of handwriting experts. *Kruidenier Estate v. Bankers Tr. Co.*, 203 Iowa 776 (local citation 780); *McColl v. Jordan*, 200 Iowa 961 (local citation 965, 966).

With the testimony of William O'Connor, the stock buyer's son, that of the handwriting expert, and the corroborative facts and circumstances revealed by the record before them, the jury were warranted in finding that appellant, beyond a reasonable doubt, is the man who stole the hogs. Due consideration has been given to the entire record, and, from such review, we are constrained to hold that the jury's finding does not lack support in the evidence. A conflict, of course, appears between the testimony of the State's witnesses and that of the appellant. Manifestly, however, it is peculiarly within the province of the jury to decide disputed facts, and determine, upon substantial evidence, that the appellant is guilty beyond a reasonable doubt.

Consequently, appellant was not entitled to a directed verdict in his favor, and there is no ground for reversal at this juncture.

III. Complaint is next made because of instruction known in the record as Number Three. In that charge, the jury were informed that the State's case rested entirely upon circumstantial evidence. The basis of the objection is that the trial court informed the fact-finding body that circumstantial evidence might be indirect, as well as direct. This was erroneous, appellant maintains, and he says that without the inclusion of the indirect circumstantial evidence, the record is not sufficient to sustain his conviction.

Contrary to appellant's contention, however, it is well established that the circumstances may indirectly, as well as directly, connect the defendant with the crime. *State v. Reno*, 67 Iowa 587. A quotation from the *Reno* case will enlighten at this point. On page 589, we find the following language:

"Their position [that of the appellants], in effect, is that, when the State undertakes to establish the guilt of one accused of crime by circumstantial evidence, it is entitled to prove only such circumstances as tend directly to show his guilt. But this

view of the rule on the subject is entirely too narrow. Any competent evidence which tends to prove any material facts in the case is admissible. Any distinct fact which the State is required to establish may be proven by circumstantial evidence; for any circumstance which tends to establish such fact has necessarily some tendency to prove the charge.''

To the same effect, see *State v. Hester*, 205 Iowa 1047. Much has been said in Division II, above, concerning the sufficiency of the evidence. Repetition of that discussion is not necessary here. Circumstantial evidence is legal evidence, and may be equal in value with direct evidence. Sometimes circumstantial evidence is more reliable than direct. Everything depends upon the circumstances. *State v. Crofford*, 121 Iowa 395.

Within the purview of the authorities cited in this division, appellant's objection to the instruction, therefore, is without merit.

IV. Pursuing his attack upon the district court's action, appellant excepts to a ruling admitting into evidence the aforesaid check. It seems that the check was dated March 5th. Re-sultantly, appellant argues that it could not have been given for the stolen hogs, because they were not taken until March 6th. So, appellant concludes, the circumstance becomes immaterial, and has no probative force whatever.

By so arguing, the appellant overlooks the fact that, under the evidence, the check was delivered Friday evening, March 7th, following the larceny. Therefore, any presumption that might arise from its date concerning the time of delivery the jury could well find had been overcome by the direct evidence that the check was delivered on March 7th, rather than the 5th. Substantiation for the State's theory also may be found in the fact that O'Connor, the stock buyer, had no blank checks at his place of business, and consequently required the seller of the hogs to come to the O'Connor home, March 7th, in order that the check might be written and delivered. Corroboration of the fact that the man selling the hogs did thus come to the O'Connor home on that night is found in the testimony of William O'Connor, the stock buyer's son.

With those facts in the record, it was not error for the district court to admit the check as an exhibit. When the check

was thus admitted, the handwriting expert properly inspected, and drew conclusions from, the indorsement thereon. Especially is that true when the record also discloses that the check, with the indorsement thereon, was cashed by the man purporting to be Johnson.

We have considered all the errors assigned by appellant, and are constrained to hold that there is no ground for reversal. Wherefore, the judgment of the district court must be, and hereby is, affirmed.—*Affirmed*.

MORLING, C. J., and EVANS, FAVILLE, and GRIMM, JJ., concur.