STATE OF IOWA, Appellee, v. MARLO HEINZ, Appellant.

No. 43487.

1242

September 21, 1937.

Rehearing Denied March 18, 1938.

John H. Mitchell, Attorney General, Buell McCash, Spec. Asst. Attorney General, and John L. Duffy, County Attorney, for appellee.

C. E. O'Connor and John J. Nelson, for appellant.

STIGER, J.—On July 25, 1935, a county attorney's information was filed charging the defendant, Marlo Heinz, with the murder of David Fox. The defendant entered a plea of not guilty. The jury returned a verdict of guilty of murder in the first degree and determined that defendant be punished with death. On July 23, 1935, Fred Fox and his wife were residing on their farm near Holy Cross, Dubuque County. They had two children, Fred Fox, Jr., referred to in the record as Junior, eight years old, and David Fox, six years of age. Mrs. Fox is a sister of the defendant. Defendant has a wife and three children. The farm buildings are south and west of the dwelling house. South of the barn is a large pasture in which Fox kept his cattle. A creek fed by a small spring runs through the pasture and between the creek and the farm buildings is a tract of timber. It was in a shallow pool in the creek about one-half mile from the house that the dead body of six-year-old David Fox was found in the late afternoon of July 23d.

Fred Fox had driven his car to the home of defendant in Dubuque, Iowa, on July 23d and about three o'clock in the afternoon Fox, Heinz, and Pete Reis started for the Fox farm. They stopped once and drank some beer. They then stopped to let Reis out of the car at his home where they drank some hard liquor. Reis gave Fox a pint of the liquor which he took with him. Defendant claims they each had three drinks in front of the house in the car, two more drinks in the house, and one drink from the pint bottle on the way to the Fox farm.

They arrived at the farm about fifteen minutes to four o'clock. Fox lay down on the davenport and the defendant changed his clothes and engaged in conversation with his sister. They talked about the garden, which he had helped her plant,

and Mrs. Fox being busy told the defendant the children would show him the garden which they did. Mrs. Fox testified that the defendant asked what time the children went for the cows and she told him about five thirty. At this time it was about four o'clock. After the defendant and the two boys had seen the garden, David came back to the house and his mother asked him if he was going after the cows and David replied that he guessed so and went out of the house. That was the last time she saw David alive.

The theory of the State is that the defendant committed that variety of sodomy known as pederasty on the body of his nephew in the anal orifice and to conceal the crime strangled him to death.

The contention of the defense is that David, in attempting to run down the bank and cross the creek to reach his uncle, the defendant, tripped at the top of the bank and fell face downward lying on his face in such a way that he turned a complete somersault, thereby twisting his neck muscles causing insensibility, and because of the swelling of the neck muscles strangulation was caused, which in turn produced the ecchymosis and cyanosis found on the neck of the child. That when he fell he was badly frightened which caused complete relaxation of the anal muscle.

Defendant admits that after they saw the garden, David and Junior went down to the creek with him.

The testimony of Junior, David's surviving brother, as to the circumstances under which they went down to the bank adjacent to the creek and the events that followed is as follows:

"When Uncle Marlo came out to the farm, he changed his clothes and talked with mother. Then we went out to see how the garden was. I took some swings on the swing and Uncle Marlo went down to the chicken house. When he came back he asked me if I would like to take a walk and I said 'yes' so we went down to the pasture and saw some cows there. Uncle Marlo layed down on the bank and told me and David to catch some bugs in the creek and we caught them with our hands and showed them to Uncle Marlo and when we got through playing around, we went up on the bank where Uncle Marlo was lying down and layed down with him. He talked to us about going fishing and swimming; then we played around some more and Uncle Marlo asked me to go up and see if supper were ready. When I left,

David was lying on the bank next to Uncle Marlo. I ran up to the house and hollered to see if supper was ready and mother told me supper was ready and I should go down and tell David and Uncle Marlo. I ran back down and when I got down to the creek where I had been lying I did not see anybody, and after a while I saw David in the water. He was not very far from where he had been lying down. I tried to take him up but I couldn't. I lifted his hand and his hand was cold. I ran up to the house to tell mother; then I ran down to Meyers to call the doctor, and when I was running up to the house I saw Uncle Marlo and he was on the other path walking away from the creek. I said to him 'David is drowned'; and he said, 'Oh'."

The defendant testified substantially as follows:

"After we had seen the garden, we came back towards the house. One of the children asked me if I saw the chicken house. I said I hadn't been there so we started down there. I don't know if we looked for eggs or just walked around and came out again. I think the children went towards the yard and I went back down to the corn crib where I put the bottle and took a drink and put it back. Then I went towards the hog pasture and I went over and crawled through the fence and when I got on the other side of this fence, one of the children hollered to me to know where I was going. I said I thought I would take a walk down to the pasture to bring the cows home. They said they wanted to come along so I waited for them. Then we headed down towards the pasture where the cows were kept and then through another barbed wire fence and walked till we came to the creek. When we got there I sat down and rolled a cigarette. As I remember it, it was a pretty nice day. It seems to me the sun was out. I know it was warm because I didn't have any shirt on. I had on a pair of bib-overalls, cut down the back and straps going over the shoulders, and my shoes and sox and sleeveless undershirt that goes with the shorts. While I was rolling the cigarette something was mentioned by David or Junior about wading and I said 'well, if you kids want to go wading go ahead' and whether they went in wading or not I don't know. Then I layed down there and dozed off I guess. I didn't go for the cows at that time. It was a little early to bring them up yet. I don't know just what I thought on it for I was just going to sit around or lay around there for a while. Then the children came up

from the creek. I guess they came from the creek, I don't know where they came from because I was asleep and that was the first I had seen of them since I saw them go toward the creek. The next time I saw them was when Junior was saying something about going home to see if supper was ready. He woke me up. I think I told him to go ahead or something. I stayed right where I was. I had been lying on my back. I don't say that I was sound asleep, but I was dozing or whatever you would call it. After Junior left, I said to David that I was going to find the rest of the cows. I started down towards the creek and David sat up. He raised up and I hollered back to him if he wasn't coming with me and he said 'no, I think I will go to the house with Junior', but I kept on over the creek. I could notice the effect of all this liquor I had to drink. I was not awful drunk. I would consider I was pretty drunk. I crossed the creek on the other side of which is a gully which runs to the south, and there is a hillside where the cows lots of times pasture and you have to walk part ways up or sometimes all the way up, but I only went part ways and I layed down again because I felt sick. I think I must of went to sleep. I don't know but I think I did, and the thing that woke me up I thought it was Junior or David yelling. I heard some one yelling 'Uncle Marlo' and I then started to run back towards the creek where I had been. I came out right where this bank runs in the creek is where I saw David lying in the water and I walked in, raised him up, and I think I took my cap off and dipped it in the water and washed his forehead and face. After I had tried to bring him to or do something for him, I realized he was dead and I think I just dropped him there and started for the house."

Dr. Bries testified for the State:

"I was summoned to the Fox farm on July 23, 1935, and, arrived there about a quarter till six in the evening. When I arrived there Mrs. Fox told me that one of her boys had drowned. When I arrived at the creek the boy was dead. I made an examination of the body. I found his lungs clear and concluded that he had not drowned. I found a cut on his lower lip about two inches long and about one-half inch deep and blood in his left ear. I could not discover any skull fracture. I noted a definite bluishness from the middle of the neck up extending over his face, ears, and up towards the forehead. That immediately made

me suspicious of foul play. I asked Marlo Heinz, he being with the boy, just what happened and he told me he and the two boys went out to get the cows and when they got up to this place they thought it was a little too early to take the cows home so he layed down on the bank and Junior went home to see if supper was ready and while he was lying on the embankment sleeping, he heard a sudden 'yip' and by investigating he found David in the shallow pool dead. On the bank of the creek I found two fresh blood spots or areas about the size of a hand about a foot apart. Heinz told me he was lying on the bank, with his feet hanging over, sleeping. There was a discoloration and abrasion of the nose and left eye which could be caused by a blow. There was a two inch laceration about a half inch deep on the lower lip. The lips were slightly swollen.''

Doctor Coady testified for the State:

''I arrived at the Fox farm about 8 o'clock in the evening and was accompanied by Sheriff Ryder and Dr. Bries. We examined the body at the house. I found his anus out of shape. It didn't really look like an anus. I would say it was ten times the size of a normal anus. With an anus dilated as much as this one it would be impossible to have control of the bowels. It would be impossible for the condition I found to be caused by a fall. The condition could have been caused by the act of sodomy. The result of my examination of David was a diagnosis of death by strangulation. I examined Mr. Heinz at the funeral home. He had an abrasion on his right hand, including the knuckle of his middle finger, an abrasion on the skin, and on his chest and arms he had what appeared to be finger nail scratches.''

Doctor Bries testified:

''Assuming that David Fox had involuntary bowel movements previous to July 23, about once a week and had a weakening of the sphincter muscle for sometime previous, I would say that the anus would not have been as greatly dilated as it was at the time of the examination.''

Doctor Coady and Doctor Johnson performed a post mortem on the body at a funeral home in Dubuque. Dr. Coady testified:

''He had an abrasion under the left eye; a laceration on his lower lip; his upper teeth were loose; he had a discoloration of

the head. Ecchymosis is nothing more than blood under the skin, the same as a black and blue mark. He had discoloration on the neck on both sides. The front of the neck was normal color. He had scratches on both knees. We examined the lungs and tested them in water showing that the child was not drowned.''

Doctor Johnson testified:

''I performed an autopsy on David Fox on the night of July 23. There was a marked bluishness of the skin, upward over the face and extending over the back of the ears and reaching nearly to the hair line and a large swelling and blueness of the chin. There were multiple lacerations on the inner side of the lower lip extending about one-half way through the lip from the inside toward the outside. Both upper central incisors were loose but in position, but instead of extending straight down, they were driven in and their general direction was inward. There were multiple scratches, like abrasions over both knee caps which were recent scratches. In my opinion the marks on the neck were the result of pressure by the hand. It was our opinion that the findings of the autopsy warranted the opinion that death was caused by strangulation. If the anus had been in the same condition previous to the time I examined him he could not have had any voluntary bowel movements.

''I examined Marlo Heinz. There were numerous scratches and abrasions on his body. They were scratches similar to those produced by finger nails with the exception of two on the large knuckle on the right hand. On the large knuckle of the right hand there were two abrasions which were through the outer part of the skin and there was a little bleeding. The measurements of these abrasions corresponded very closely to the size of the upper central incisors. The scratches and abrasions on the body of Marlo Heinz were comparatively fresh.''

Mrs. Fox, mother of David, testified that ''he had full control of his anus, he was a little harder to train than the average child but it was nothing involved that you would call entirely involuntary movements.''

About noon of the day after the death of David, the defendant signed a confession which stated that he strangled the boy to death after committing on him the crime of sodomy. Prior to the written confession, he told Sheriff Ryder that he strangled the boy with his hands.

Edward Vosberg, police desk sergeant of Dubuque, testified to a conversation between the defendant and his wife which occurred in the presence of the defendant's father, wife, and Detective Anthony and the witness about one fifteen o'clock in the afternoon, about an hour and a half after the written confession was signed. This conversation was as follows: Mrs. Heinz stated to her husband, "I didn't think you could do anything like that unless I heard you say it yourself." Defendant replied, "Well, there is no need lying about it, I did it. I confessed because I thought it was the only last honorable thing I could do. I might have held out awhile but with the evidence they had I thought it was the honorable thing to do to confess it."

There was a bank extending up from the creek and defendant offered testimony that the injuries and discolorations on the body of David could have been caused by a fall; that suffocation is one form of strangulation and it was conceivable that a person might, if stunned into insensibility, lie in such a manner as to die of suffocation.

We have extended into the record that portion only of the evidence considered material to the issues presented on appeal.

■■■ I. The county attorney in his opening statement told the jury that "the evidence will show that Marlo Heinz made a written confession in the presence of Chief of Police Giellis." The objection was that the statement was an opinion and conclusion. The defendant signed a written confession in the presence of Chief of Police Giellis and others and over the objection of the defendant it was admitted in evidence. We observe nothing to indicate bad faith or intentional wrong on the part of the county attorney. The conversation was admitted in evidence by the court and the county attorney was manifestly justified in a belief that the confession was admissible in evidence. All that was required was that he act in good faith and had reasonable ground to believe that the evidence was admissible. State v. Allen, 100 Iowa 7, 69 N. W. 274. We find no misconduct on the part of counsel for the State.

■■■ II. The defendant claims the court erred in admitting State's exhibits A and C because they are not true and correct representations of what they purport to show. Exhibits A and C are photographs of the body of David Fox taken by Mr. Link, a professional photographer, on the night of July 23, at the funeral home in Dubuque. Mr. Link testified that the said

exhibits were true representations of what they purported to show. The objection to exhibits A and C was that they are incompetent, irrelevant, and immaterial, no proper foundation laid and for the further reason that they do not show the condition of the body of David Fox as on the evening of July 23, 1935, at the Fox farm so that laymen could properly interpret the markings thereon.

The witness was subjected to a long cross-examination during which he stated that he did not know whether the garment worn by David was in the same condition it was on the night of July 23, at the Fox farm; that the exhibit did not show whether the hair was wet or dry; that he could identify objects in the picture and determine whether they were abrasions, contusions, lacerations, blood stains, mercurochrome, but that most laymen could not; that most laymen could not determine the cause of the lights and shadows.

On re-direct examination the witness pointed out the bruises and abrasions on the throat and neck and stated they were correct representations. Dr. Johnson was shown the markings on the exhibits and stated in his opinion they were caused by compression on the neck by fingers.

The exhibits were not offered to show the condition of the body at the Fox farm but to show its condition at the time and place they were taken. Dr. Johnson, who performed the post mortem examination at the funeral home, readily identified the abrasions and bruises on the exhibits. It is true that the witness did not know the condition of the body prior to the taking of the photographs. It was not necessary for the witness to have personally observed the condition of the body prior to the taking of the photographs. In the case of State v. Matheson, 130 Iowa 440, loc. cit. 443, 103 N. W. 137, 138, 114 Am. St. Rep. 427, 8 Ann. Cas. 430, we stated:

"The court takes judicial notice of the fact that by the ordinary photographic process a representation may be secured, sufficiently truthful and reliable to be considered as evidence with reference to objects which are in a condition to be thus photographed, without regard to whether they have been actually observed by any witness or not."

See State v. Baker, 157 Iowa 126, 135 N. W. 1097, 138 N. W. 841. There is nothing to indicate that the exhibits were not fair

representations and we find no reason for saying that there was error in admitting the photographs into the evidence.

■■■ III. Another assignment of error is that the court erred in failing to sustain the defendant's objection to the following question asked Chief Giellis on his direct examination in regard to the written confession—State's Exhibit H.

"Q. Chief, was that statement signed by Heinz voluntarily? A. Yes, it was."

The defendant contends that the witness was not competent to decide that Exhibit H was signed voluntarily and that the record discloses that the confession was not signed voluntarily but was the result of an unmerciful grueling on the part of peace officers concerning which ordeal the witness in question had no knowledge of his own.

The witness testified:

"About 11:00 o'clock on the morning of July 24, I talked to the defendant for the first time at the City Hall in Dubuque. Before he signed the written confession, and at that time, the defendant made some statements in connection with the alleged murder at the Fox farm which were free and voluntary and no force was used to secure the statements. Later, about noon of the same day, the defendant signed the confession, Exhibit H, in his presence and in the presence of the county attorney and the assistant county attorney; no force was used at that time or any other time as far as I know; the defendant read the statement before he signed it and stated it was his free and voluntary act. Later when I took him to the cellroom, he said he felt better after making his confession and that they were 'all awful kind to me during the time they talked with me.' The confession was handed to him and he sat there quietly with it and said that it was a true statement so I took it from that, that he had read it. That is as close as I can come."

The witness then stated that the statement signed by Heinz was signed voluntarily.

The witness had been with the defendant alone a short time before he signed the confession. He observed his conduct and demeanor, and heard his statements for an hour prior to the time he signed the confession. He observed him sign the confession. The witness told the circumstances leading up to the

time the defendant signed the confession and then stated that the confession was voluntary. It would be difficult for him to adequately describe to the jury the demeanor, expression, and attitude of the defendant as they appeared to him prior to and at the time he signed the confession and it was permissible for him to give his conclusion. In the case of State v. Klute, 160 Iowa 170, 180, 140 N. W. 864, 868, in considering a similar question and answer the court stated:

"The question itself called for evidence in the nature of a conclusion, but the answer is the statement of the result of observation and knowledge as to a collective fact, and is competent. The witness had seen and talked with deceased, but could not well detail to the jury all the things he observed that caused him to conclude that deceased was conscious and knew what he was doing." See State v. Dickson, 200 Iowa 17, 202 N. W. 225.

It is not error to permit a witness to testify that a confession was voluntary, as being an opinion or conclusion, if the circumstances of the confession are in evidence. 16 C. J., 733.

The trial court was right in overruling the objection.

██ IV. The defendant alleges that the court erred in admitting written confession, Exhibit H, because it was not the free and voluntary confession of the defendant.

It is elemental that a confession to be admissible must be free and voluntary. It must not be induced by a promised benefit or fear of threatened injury or by inquisitorial methods which directly or indirectly menace the life or safety of the prisoner. State v. Thomas, 193 Iowa 1004, 188 N. W. 689; State v. Storms, 113 Iowa 385, 85 N. W. 610, 86 Am. St. Rep. 380. In the case of State v. Thomas, 193 Iowa 1004, loc. cit. 1021, 188 N. W. 689, 696, the court stated in regard to submitting the question of the voluntary character of a confession to the jury that:

"There is some confusion in the authorities upon this proposition; but it is settled in this State that, where the free and voluntary character of the statements relied upon as a confession is the subject of dispute or conflict in the evidence, the question may properly be submitted to the jury. * * * If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the State, by its own evidence, negatives these essentials to its use in evidence, it is the

duty of the court to sustain the objection and refuse its submission to the jury."

The trial court submitted the question of the voluntary character of the confession to the jury under a correct instruction.

The written confession contained the following statement: "that I, Marlo Heinz, of Dubuque, Iowa, without any promise made to me and without any threats made to me and with my own free will hereby freely and willingly confess and admit that I murdered David Fox."

**■■■** Where a confession appears on its face to be free and voluntary the burden is on the defendant to show it is incompetent. State v. Storms, 113 Iowa 385, 85 N. W. 610, 86 Am. St. Rep. 380; State v. Icenbice, 126 Iowa 16, 101 N. W. 273.

Chief Giellis testified that no force was used in securing the confession, that it was voluntary, and that the defendant stated at the time he signed the confession and afterwards that he did it voluntarily because it was the truth. Mr. Fuhrmen, a newspaper reporter, testified that defendant told him, about 7:30 o'clock in the evening of the day the confession was signed, that he could have held off a little longer but thought the most honorable thing he could do was to confess it and so he confessed to Sheriff Ryder, Mr. Tschudi, and Chief Giellis. Paul Anthony, a detective, testified that defendant stated to his wife in the presence of the witness, defendant's father, and Edward Vosberg, desk sergeant, " 'Well, I did it. I held out so long that I thought the most honorable thing to do was to say I did it. Well, I did it, and ain't it an awful thing.' "

Defendant did not deny that he made the admissions testified to by the State's witnesses.

The only conflict in the evidence is made by the testimony of the defendant who claims the confession was involuntary.

The defendant was subjected to oral examination by the county attorney and sheriff from about 11:00 o'clock at night until about noon the next day. He testified he was not permitted to sleep during this time. There were intervals during which he was not examined. He was taken to the funeral home and was compelled to watch a part of the post mortem examination.

The defendant did not request an attorney and, had he done so, the fact that he was not represented by counsel at the time he signed the confession would not render it involuntary. State v.

Neubauer, 145 Iowa 337, 124 N. W. 312. The evidence was in plain contradiction and it follows the court was right in submitting the question to the jury.

■■■ V. Another assignment of error is that the court erred in permitting Dr. Johnson to testify as to what in his opinion caused the marks on the neck of David Fox.

The main contention of the defendant is that the witness should not have been permitted to testify that the marks were caused by fingers since this was an opinion and a conclusion beyond his qualifications as an expert and invaded the province of the jury.

Dr. Wayne testified that in his opinion "those marks were caused by compression on the neck by fingers."

The province of the jury was to decide whether or not the defendant killed David Fox. The witness did not state that in his opinion the accused caused the death of the decedent or that the fingers of the accused caused the marks on the throat.

It is the established law of this State that an expert may give his opinion as to the cause of death and the kind of instrument used to inflict the wounds. This rule and the reasons for it are fully considered in the case of State v. Hessenius, 165 Iowa 415, 146 N. W. 58, L. R. A. 1915A, 1078. See, also, State v. Brackey, 175 Iowa 599, 157 N. W. 198. In the early case of State v. Morphy, 33 Iowa 270, 11 Am. Rep. 122, we stated: "the rule which admits the testimony of medical men as to the instruments producing, and the nature of wounds, the cause of a disease or the consequences of wounds, is elemental and is so recognized and laid down by the best writers on the law of evidence."

There was no error in admitting this evidence.

■■■ Defendant next claims that the court erred in overruling the defendant's motion to direct a verdict of not guilty made at the close of the State's case and after the State had rested. The defendant urges that in order to convict on circumstantial evidence such evidence must point to only one conclusion; that the record conclusively shows that reasonable minds could as likely find that the death of David Fox was the result of a fall as they could that he was murdered.

The defendant testified that the last he saw of David was when David stated that he would go to the house with Junior; that after David made that statement, the defendant turned and started across the creek and up the hill after the cows.

The woods were between the creek and the house and under defendant's testimony, David's natural course, as he went to join Junior, who had started on his way to see if supper was ready, was away from the bank and creek and into the woods and toward his home. David was on the bank when he told his uncle he was not going with him. The defendant's evidence is not persuasive that David fell from the bank to his death.

In the exhibits offered by the parties, the bank appears to be less than six feet high, with some slope to the creek. David's body was found some little distance from the foot of the bank out in the creek. Fox testified it was "maybe eight or ten feet high, it might be as much as fifteen feet high."

That a conviction may rest on circumstantial evidence and that circumstantial evidence may be of equal value with direct evidence and also may be the most convincing and satisfactory testimony, are propositions too well established to require discussion. See State v. Manly, 211 Iowa 1043, 233 N. W. 110; State v. Moss, 185 Iowa 158, 168 N. W. 164.

To justify a conviction on circumstantial evidence the circumstances relied upon must not only be consistent with the defendant's guilt, but inconsistent with any other rational hypothesis. State v. Hooper, 222 Iowa 481, 269 N. W. 431.

The injuries on David's body were not those that naturally follow a fall violent enough to stun or kill him. Defendant's theory that David tripped at the top of the bank and fell face forward lying on his face in such a way that he turned a complete somersault thereby twisting his neck muscles causing insensibility, and because of the swelling of the neck muscles, strangulation, which in turn produced ecchymosis and cyanosis found on the neck and face of the child is, under the record, an improbable one and not sustained by the medical testimony offered by the defendant. There is positive evidence that he did not drown. That David may have fallen to his death while Marlo Heinz slept is under this record most improbable. The facts and circumstances relied on in this case are not only consistent with defendant's guilt but are inconsistent with any other reasonable hypothesis. In discussing this assignment we have assumed with the defendant that the evidence was all circumstantial. In addition to convincing circumstantial evidence, there are the written and oral confessions of the defendant. The trial court was right in overruling the motion for a directed verdict.

■■■ VI. Instruction number 11 reads as follows:

"The word 'premeditated' as applied to this case, means that the defendant, Marlo Heinz, considered the killing of the said David Fox and that after considering and weighing the killing of said David Fox, formed the specific intent to kill him and killed him in pursuance of this specific intent so formed. Such intent to kill must have existed before the killing, but need not have existed for any particular length of time before said killing."

Defendant predicates error on this instruction, claiming that it specifically told the jury that the defendant killed David Fox.

That instructions must be read and construed in their entirety is too well established to require citation of authorities.

In instruction No. 4, the court defined murder in the first degree and then told the jury that it was incumbent on the State to prove beyond a reasonable doubt the material allegations of the information and each element of first degree murder. The court then defined the meaning of the words "wilful" and "deliberate" in successive instructions and in instruction No. 11, defined the word "premeditated".

It is clear that in instructions Nos. 9, 10, and 11, the court was explaining the prior use of the words in instruction No. 4.

In instruction No. 27, the court told the jury that "no language used in these instructions should be construed by you to mean that the court entertains any opinion in relation to the material and essential facts of this case."

Instruction No. 28 stated, "you are to consider and construe all of the instructions together and apply them as a whole to the evidence in this case."

The instructions as a whole were accurate and unusually complete. Defendant's criticism of instruction No. 11 that it assumed defendant killed David is unwarranted and no prejudice could have resulted to the defendant from this instruction.

■■■ VII. The defendant claims the court erred in giving the following instruction No. 20.

"Defendant has testified that he did not kill David Fox and was not close enough to him at the time said David Fox met his death to have killed him. He makes no claim that he may have killed the said David Fox while under the influence of intoxicat-

ing liquor or in a state of drunkenness. Upon this state of the record, you are instructed that if you find, beyond all reasonable doubt, that the defendant committed the crime of murder in the first degree, or murder in the second degree, as herein instructed, then any evidence of his intoxication will not excuse his commission of said crime, but you may consider the evidence relating to this intoxication for any other purpose that it may be material and relevant.''

Defendant's objection to the above instruction is that it precluded the jury from considering the question of intoxication of the defendant in their determination of his mental ability to form a specific intent to deliberate or to premeditate or to kill with malice aforethought. Defendant urges that the jury could have found the defendant guilty of murder but incapable because of intoxication of performing the mental processes necessary under the law to bring the crime within the definition of murder in the first degree.

The defendant did not interpose the affirmative defense of intoxication. He does not claim that he killed David Fox while intoxicated to the degree that he was incapable of forming a specific intent to kill. He claims he was some distance away from the place where David met an accidental death. After David's body was found the defendant stated that he was drowned.

If the defendant had interposed the defense of intoxication, he would have had the burden of establishing the defense by a preponderance of the evidence. State v. Crietello, 197 Iowa 772, 197 N. W. 902.

The defendant does not claim he was too drunk to form a specific intent to kill. He testified, ''I was not awful drunk but as for myself I would consider I was pretty drunk.''

Partial drunkenness does not make impossible the formation of a criminal intent. State v. Patton, 206 Iowa 1347, 221 N. W. 952. Witnesses for the State testified defendant was sober when he came up from the pasture after David's death.

The conversation with his sister and his statements and conduct before he and the boys started to the creek did not reveal intoxication on the part of the defendant. At the creek he talked to the boys in a natural sober manner just prior to the time Junior left to see if supper was ready. We are satisfied that the evidence is insufficient to prove that the defendant was so in-

toxicated that he was unable to form a criminal intent. No error can be predicated on this instruction.

■■■ VIII. The defendant further claims that the court erred in failing to sustain his motion for a new trial on the ground that the verdict is not sustained by sufficient evidence.

It is the special province of the jury to pass on questions of fact. This court will not interfere with the verdict of the jury unless it is clearly against the weight of the evidence and there is such an utter lack of support for the finding of the jury as to require a reversal. State v. Harrington, 220 Iowa 1116, 264 N. W. 24, 103 A. L. R. 861; State v. Manly, 211 Iowa 1043, 233 N. W. 110. In this case we find in the record substantial support for the verdict which was not contrary to law nor against the clear weight of the evidence and the trial court was right in overruling the motion for a new trial on this ground.

■■■ IX. Defendant further alleged the court erred in admitting State's Exhibits A and C, which are photographs taken of the body at the funeral home, because certain lights and shadows might be mistaken by the jury for bruises and discolorations.

The photographer and the physician identified on the exhibits the marks on the neck and face, distinguishing them from the lights and shadows. Physicians had testified to the marks on the body and located them on the photographs to further explain their testimony.

A casual examination of the exhibits reveals the lacerations and discolorations described by the physicians from their personal observation. These marks are easily distinguishable from shadows on the picture. We are convinced that no prejudice resulted to defendant from the admission of these photographs.

■■■ X. Still another assignment of error is that the question of first degree murder should not have been submitted to the jury because there was no evidence of deliberation or premeditation and the evidence introduced in the case viewed in the light most favorable to the contention of the State does not establish that there was a specific intent to kill.

Malice means that condition of mind which prompts one to do a wrongful act intentionally without legal justification or excuse. State v. Burris, 198 Iowa 1156, 198 N. W. 82. The uniform holding of this court is that the deliberate, violent use of a deadly weapon or an instrument likely to cause death with oppor-

tunity to deliberate is evidence of malice, deliberation, premeditation, and intent to kill. Malice and a criminal intent are inferred from the intentional use of a deadly weapon in a deadly manner unless the circumstances in evidence rebut the presumption. State v. Decklotts, 19 Iowa 447; State v. Zeibart, 40 Iowa 169; State v. Burris, 198 Iowa 1156, 198 N. W. 82; State v. Matheson, 220 Iowa 132, 261 N. W. 787.

Premeditation and deliberation need not exist for any particular length of time before the killing. State v. Troy, 206 Iowa 859, 220 N. W. 95. We stated in the case of State v. Woodmansee, 212 Iowa 596, l. c. 611, 233 N. W. 725, 733, where the defendant has selected a deadly weapon, and with opportunity to deliberate has intentionally used it in a deadly manner " 'it is proper to submit the question of first degree to the jury, although there is no specific proof of deliberation and premeditation, apart from the proof of the violent infliction of a mortal wound.' "

In presenting this issue the defendant again overlooks his written and oral confessions and admissions.

The hands and fists of the defendant violently used to strangle and beat to death this six-year-old child constituted an instrument likely to produce death and were dangerous weapons. Clearly this assignment of error must be rejected. See State v. Sayles, 173 Iowa 374, 155 N. W. 837. In the case of State v. Sullivan, 51 Iowa 142, 50 N. W. 572, the following instruction was approved:

" * * * when a man assaults another with, or uses upon another, a deadly weapon in such a manner that the natural, ordinary and probable result of the use of such deadly weapon in such manner would be to take life, the law presumes that such person so assaulting intended to take life."

The defendant had a fair, impartial trial. He was represented by able counsel. The jury found him guilty of committing a heartless, cruel murder after descending to the lowest depths of human depravity. We find no error in the record, no reason for interfering with the verdict.—Affirmed.

HAMILTON, C. J., and DONEGAN, ANDERSON, and PARSONS, JJ., concur.

KINTZINGER and MITCHELL, JJ., take no part.